

Villanova University School of Law

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2005

# Files v. Exxonmobil Pension

Precedential or Non-Precedential: Precedential

Docket No. 04-2390

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Files v. Exxonmobil Pension" (2005). *2005 Decisions.* Paper 192.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/192

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-2390

_____

RITA M. FILES,

Appellant

v.

EXXONMOBIL PENSION PLAN;
ADMINISTRATOR-BENEFITS FOR
THE EXXONMOBIL PENSION PLAN;
JEANNETTE C. KELLINGTON;
GARCES & GRABLER, P.C.;
EDWARD J. NOWICKI;
ROBERT H. GOODWIN;
JOHN DOES, 1-5; JOHN DOES 6-10;
JANE DOES, 1-5; JANE DOES 6-10;
ABC, P.A., DEF PARTNERSHIP AND/OR XYZ, P.C.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 02-cv-05374)
District Judge:  Honorable Garrett E. Brown, Jr.

_____

Argued May 11, 2005
Before: SLOVITER and FISHER, *Circuit Judges*,
and POLLAK,* *District Judge*.

(Filed November 2, 2005)

Richard D. Brown (Argued)
Green & Savits
35 Airport Road, Suite 350
Morristown, NJ 07960
          *Attorney for Appellant*

Joseph T. Walsh, III (Argued)
McCusker, Anselmi, Rosen, Carvelli & Walsh
127 Main Street
Chatham, NJ 07928
          *Attorneys for Appellees*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

This case involves the pursuit of benefits from the ExxonMobil Pension Plan (formerly known as the Annuity Plan) ("Pension Plan") by the ex-wife of a now-deceased Pension Plan participant. The principal issue is whether either the Property Settlement Agreement ("PSA") entered by the Superior Court of New

_____

*The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2

Jersey, Chancery Division: Family Part, Ocean County ("New Jersey Court"), prior to the ex-husband's death, or an order *nunc pro tunc* obtained from that same court subsequent to the ex-husband's death, constitutes a Qualified Domestic Relations Order ("QDRO") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Retirement Equity Act of 1984 ("REA"), *see* 29 U.S.C. § 1056(d)(3). The District Court, in reliance on its broad reading of our opinion in *Samaroo v. Samaroo*, 193 F.3d 185 (3d Cir. 1999), *cert. denied*, 529 U.S. 1062 (2000), granted the Pension Plan's motion for summary judgment, concluding that the order *nunc pro tunc* could not create a right to survivorship benefits after the ex-husband's death. As to the PSA entered before the ex-husband's death, the District Court concluded that it did not meet the statutory QDRO requirements and that any attempt to qualify that order as a QDRO after his death to provide the ex-wife with survivorship benefits was improper under *Samaroo.* Because we conclude that the PSA constituted a QDRO pursuant to the process contemplated within 29 U.S.C. § 1056(d)(3), providing the ex-wife with a separate interest in the pension benefit prior to her ex-husband's death, we will reverse the District Court's order and remand for further proceedings.

## I. Facts

Rita Files ("Files") married Ed Rutyna ("Rutyna") in November 1972. Rutyna worked for ExxonMobil from September 5, 1972 to April 7, 1993, and participated in two ERISA-governed plans through ExxonMobil – the Pension Plan and a Savings Plan (formerly known as the Exxon Thrift Plan) ("Savings Plan").[1] When he left ExxonMobil in 1993, Rutyna had a fully-vested pension entitlement. However, since he was under fifty years of age, he was

---

[1]The Pension Plan and Savings Plan, although distinct benefit plans, share the same administration.

not yet eligible to receive his pension; the earliest he would become eligible would be September of 1996, on reaching fifty.

Nearly two years after Rutyna could begin receiving pension benefits, Rutyna and Files agreed to the PSA, which was incorporated into the Dual Judgment of Divorce entered by the New Jersey Court on July 16, 1998. Paragraph 3.2 of the PSA, provided in relevant part:

> The Husband is the owner of an Exxon pension and Exxon . . . [Savings] Account and a TOSCO pension. Wife hereby waives, now and forever, any right, title or claim on the Husband's TOSCO pension funds. The wife shall be entitled to one-half of the Exxon pension and one-half of the Exxon . . . [Savings] Account. The transfer shall be by QDRO ["qualified domestic relations order"] as to the pension and by transfer to an account designated by the wife as to the . . . [Savings] Account.

After the PSA was entered by the New Jersey Court, Rutyna's divorce counsel, by letter dated August 16, 2000, advised the ExxonMobil Benefits Administrative Office ("Benefits Administrator") of the divorce and requested a sample QDRO "in order to distribute his Pension and . . . [Savings] fund in accordance with the terms of the divorce."[2] The Benefits Administrator

---

[2]Because of the importance of the statutory scheme to an understanding of the parties' respective positions regarding whether the PSA meets the statutory requirements for a QDRO, we set forth the relevant statutory provisions throughout our factual recitation. ERISA's anti-alienation provision states that "[e]ach pension plan shall provide that benefits provided under the plan may not be

4

responded, by letter dated September 16, 2000, that Rutyna's written authorization was required for the release of information. By letter dated September 18, 2000, Rutyna's divorce counsel provided Rutyna's authorization for the release of information to distribute his pension and savings accounts in accordance with the terms of the PSA. The Benefits Administrator then provided, by letter dated September 29, 2000, a Pension Plan estimate, a statement of account for the Savings Plan as of September 27, 2000, a package of materials explaining the Pension Plan's QDRO policies and practices, and a sample QDRO. An enclosed Q & A sheet entitled "Information About Thrift and Annuity Plan Benefits as Part of the Divorce Process" stated that –

---

assigned or alienated." 29 U.S.C. § 1056(d)(1). The REA amended that anti-alienation provision by setting forth a process to give effect to divorce decrees and state-court orders that pertain to ERISA regulated plans if the order is determined to be a QDRO. *See Boggs v. Boggs*, 520 U.S. 833, 847 (1997); *McGowan v. NJR Service Corp.*, 423 F.3d 241, 249 (3d Cir. 2005); 29 U.S.C. § 1056(d)(3)(A). "QDRO" is defined as a "domestic relations order . . . which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan," and which meets certain statutory requirements, which are set forth in 29 U.S.C. § 1056(d)(3)(C)(i)-(iv). 29 U.S.C. § 1056(d)(3)(B)(i); *see infra* at n.7. "[D]omestic relations order means any judgment, decree, or order . . . which . . . relates to the provision of . . . marital property rights . . . made pursuant to a State domestic relations law. . . ." 29 U.S.C. § 1056(d)(3)(B)(ii). An "alternate payee' is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K).

5

Once Exxon's Benefits Accounting or Benefits Administration Office receives written notice of a divorce (either pending or final), . . . [Savings] and . . . [Pension] Plan benefits will generally be 'blocked.' If benefits are blocked, the participant may not receive them until one of the documents noted below [e.g. a divorce decree or a QDRO] is provided or 18 months has passed from the time the participant could first receive the benefits.[3]

---

[3]This 18-month block is consistent with the process contemplated by ERISA § 206(d)(3)(H)(i)-(v), 29 U.S.C. § 1056(d)(3)(H)(i)-(v), which provides:

(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts . . . which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18-month period described in clause (v) the order ... is determined to be a . . . [QDRO], the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18-month period described in clause (v) -

   (I) it is determined that the order is not a . . . [QDRO], or

   (II) the issue as to whether such order

6

Indeed, following receipt of the August 16, 2000 letter from Rutyna's divorce counsel, the administrator blocked Rutyna's savings account.[4]

is a qualified domestic relations order

is not resolved,

then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18-month period described in this clause is the 18-month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

[4]When questioned as to whether that block also applied to the pension account, Rodney Leis, testifying as the Pension Plan's designee pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, confirmed that, consistent with ERISA, 29 U.S.C. § 1056(d)(3)(H)(i)-(v), a pension account generally would be blocked for retirees once the Plan "knew that somebody's in the process of divorce." As to terminees (which is what Rutyna was), Leis testified "so the general question would we put a block on the pension plan, if we know that there was an imminent retirement and they also had the divorce, I certainly hope that our organization put a block on both of them [the savings and the pension plans]." A. 183. He further characterized this as "an administration procedure that we didn't send money to the wrong parties." *Id*. Although Files contends that the ExxonMobil Human Resources Department confirmed, in

7

But, Rutyna's divorce counsel never provided the QDRO information received from the Pension Plan to either Files or her counsel. When Rutyna died on February 25, 2001 at age 54, no QDRO had been submitted to the Pension Plan.

After Rutyna's death, a letter exchange ensued between Files and the Benefits Administrator setting forth their respective positions regarding Files's entitlement to benefits under each Plan pursuant to the PSA. Three (3) days after Rutyna's death, Files's divorce counsel notified Exxon's legal department of the death, acknowledged that no QDRO had been filed, and inquired whether the Pension Plan would honor the PSA. Files herself also notified the Plans of Rutyna's death in her capacity as executrix of his estate. The Benefits Administrator replied to Files by letter dated March 14, 2001, seeking a death certificate and stating unequivocally that as to the Pension Plan "there are no survivor benefits due and payable."[5] Files's new counsel (also

correspondence to Rutyna's divorce counsel dated August 29, 2000, that a block was placed on both the savings and pension accounts, the Pension Plan clarified in its correspondence of October 24, 2001 to Files's counsel that the block pertained only to the savings account. Consequently, whether the block also pertained to the pension account is subject to dispute.

[5]From the outset, the Plan characterized the pension benefits sought by Files as "survivor benefits," which are explicitly provided for within ERISA. *See* 29 U.S.C. § 1055. 29 U.S.C. § 1056(d)(3)(F) provides that to the extent provided for in a QDRO, a former spouse of a plan participant shall be treated as a surviving spouse for purposes of § 1055 (providing for mandatory plan provisions regarding joint and survivor annuity and pre-retirement survivor annuity provisions). ERISA, however, does not insist that a state court recognize a former spouse as an alternate payee to such an

her counsel in this appeal), then wrote to the Plans on March 31, 2001, requesting summary plan documents and asking that no distribution be made until he could determine whether the PSA met the QDRO requirements for each Plan. A week later, by letter dated April 6, 2001, Files's counsel wrote another letter, enclosing the PSA, explaining Files's position that the PSA was a QDRO as to both the Savings and Pension Plans, and requesting distribution of benefits pursuant to both Plans. But, that letter characterized the pension benefit sought as a fifty percent "survivor benefit" under the Pension Plan and requested forms to allow Files to "elect commencement of her surviving spouse benefit."[6]

The administrator of both the Savings and the Pension Plans, by letter of July 18, 2001, denied Files's claim for benefits pursuant to the PSA, indicating within its determination that: (1) the PSA

interest in her spouse's pension, but merely yields to the prerogative of state law to do so. *See Critchell v. Critchell*, 746 A.2d 282, 286 (D.C. Cir. 2000). Nor does ERISA limit the plan benefits that may be addressed within state court domestic relations orders to "survivor benefits." Accordingly, the Plan's characterization of the benefits Files seeks as "survivor benefits" does not control our determination of whether the domestic relations orders in question constitute QDROs.

[6]We note that the imprecision in characterizing Files's claim for pension benefits as one for a "fifty percent survivorship benefit" in light of the Plans March 14, 2001 correspondence stating that as to the Pension Plan there were no "survivor benefits due and payable" only served to confuse this already difficult record as to the benefit that Files actually sought. That imprecision, however, was later clarified by Files's counsel when describing her claim as one for a "separate interest" in fifty percent of Rutyna's pension benefits.

9

would be treated as a QDRO for purposes of the Savings Plan (and specifically that Files would get one-half of that account and, because of the lack of a beneficiary designation, Rutyna's children would get the remainder); (2) the PSA would not be treated as a QDRO for purposes of the Pension Plan; and (3) the absence of an award of "survivor benefits to Alternate Payee" in the PSA, coupled with Rutyna's death before either Files or Rutyna commenced their receipt of Pension Plan benefits, resulted in no benefits payable to Files as an "Alternate Payee" because the PSA did not award her surviving spouse benefits.[7]  That letter also stated that the Pension Plan would

---

[7]The Pension Plan based its denial of QDRO status to the PSA as regards the pension on the following statutory provisions.  A domestic relations order is a QDRO "only if such order clearly specifies . . . (i) the name and last known mailing address . . . of the participant and . . . of each alternate payee covered by the order, (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined, (iii) the number of payments or period to which such order applies, and (iv) each plan to which such order applies," (29 U.S.C. § 1056 (d)(3)(C)(i)-(iv)) and "only if such order –

> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
> (ii) does not require a plan to provide increased benefits (determined on the basis of actuarial value), and
> (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a . . . [QDRO]."

10

not entertain a *nunc pro tunc* order with respect to the Pension Plan survivor benefits as that would violate 29 U.S.C. § 1056(d)(3)(D) by requiring the Pension Plan to pay increased benefits. The Pension Plan's position is premised on its determination that Rutyna's pension benefits lapsed upon his death in the absence of any designated survivor annuity; consequently, any state court DRO providing for payment of pension benefits to an alternate payee that was presented to the Pension Plan subsequent to Rutyna's death would, in the Pension Plan's opinion, result in the Pension Plan having to provide increased benefits in violation of 29 U.S.C. § 1056(d)(3)(D)(ii).

By letter dated August 9, 2001, Files's counsel appealed administratively the Pension Plan's denial of Files's claim for pension benefits pursuant to the PSA. In that letter, Files's counsel stated that it was his understanding, based on the block placed on the savings account, that the Pension Plan was on notice of the divorce proceedings prior to Rutyna's death. He further explained that Files was seeking to enforce an interest created by the PSA during Rutyna's lifetime, entitling her to fifty percent of Rutyna's accrued benefits, which was enforceable by Files in her own right regardless of Rutyna's death because that interest was not a surviving spouse benefit. Files's counsel also enclosed with that letter "a proposed form of separate interest QDRO" and inquired whether it would qualify as a QDRO for Pension Plan purposes upon its entry by the New Jersey Court. The letter explained: "It should be evident from the interest thereby created that Ms. Files['s] benefit is neither a survivor benefit nor a benefit that would increase the Plan's cost . . . [A]s structured the benefit would have been removed from Mr. Rutyna's interest effective as of the date of the...[PSA]."

---

29 U.S.C. § 1056(d)(3)(D)(i)-(iii).

11

The Pension Plan again denied Files's claim for benefits pursuant to the PSA on October 24, 2001. First, the Pension Plan clarified that a block had been placed only on Rutyna's savings account, not on his pension account. Next, the Pension Plan quoted extensively from its Summary Plan Description to support its denial – "if a terminee [which is what Rutyna was[8]] dies before a vested pension benefit payment begins and without a surviving spouse no benefit is payable." The Pension Plan concluded as follows:

> We have reviewed the 1998 PSA and have determined that it does not specifically state that Ms. Files shall be considered a surviving spouse. Survivor benefits are fixed as of the participant's death and the proposed DRO . . . would expand the liability of the Plan. Your argument that a separate interest DRO would have given Ms. Files survivor rights is well taken but there is no assurance that a separate interest DRO is what would have been agreed to by the parties. Therefore, we cannot qualify the . . . [proposed DRO] as a QDRO at this time as no pension benefits are payable in accordance with . . . the Plan.

Files's counsel replied with yet another appeal dated December 17, 2001, again requesting pension benefits pursuant to the PSA. He explained that a QDRO was entered within the eighteen month segregation period following notice to the Plan of the divorce proceedings. The letter continued that because Files was granted a separate interest enforceable under state law effective upon entry of

---

[8]The Summary Plan Description for the Pension Plan defines "terminee" as a "person who separates from service without becoming a retiree."

12

the PSA, after entry of the QDRO, that interest must be paid to her upon her request following Rutyna's earliest retirement age under the Pension Plan.

In light of the Pension Plan's continued denial of Files's claim pursuant to the terms of the PSA, upon Files's request, the New Jersey Court entered a subsequent order dated February 7, 2002, providing:

> NOW, THEREFORE, the Court does hereby enter this Order nunc pro tunc from the date of the . . . [PSA], July 16, 1998, as and for a Qualified Domestic Relations Order [QDRO] within the meaning of . . . Section 206(d) of . . . [ERISA], for the express purpose of enabling . . . [Files] to compel the . . . [Pension Plan] to make payment to her of her property entitlement under state law in accordance with the Domestic Relations Order embodied in this Court's Dual Judgment of Divorce entered on July 16, 1998.

(hereinafter, "Order *nunc pro tunc*"). By letter dated February 28, 2002, a copy of this Order *nunc pro tunc* was forwarded to the Pension Plan, which it forwarded to its consultants for review. On May 30, 2002, the Pension Plan informed Files that, given the entry of the Order *nunc pro tunc*, it was no longer considering whether the PSA would qualify as a QDRO. By letter dated October 7, 2002, the Pension Plan's consultants denied Files's claim for benefits pursuant to the Order *nunc pro tunc* explaining:

> [The Pension Plan] will not qualify an order pertaining to the [Pension Plan] that is first submitted to the Plan and entered by the Court after a participant's date of death. On the date of [Rutyna's]

13

death, he was not married, and the Plan did not have a QDRO on file pertaining to his benefit. Therefore in accordance with the terms of the Plan, no further benefit is payable to any party.

## II. Procedural History

Files initiated this action by filing a four count complaint in the United States District Court for the District of New Jersey. In Count I, against the Pension Plan and its Administrator, she requested benefits and alleged a breach of fiduciary duty claim related to the Pension Plan's failure and refusal to pay her benefits in accordance with the PSA or the Order *nunc pro tunc*. In Counts II through IV, she alleged legal malpractice against both her own and Rutyna's divorce counsel, alleging that counsel had failed to effectuate the transfer of her interest in the Pension Plan benefits by (1) failing to prepare the PSA in a form that would be enforced by the Pension Plan; (2) failing to prepare a QDRO prior to Rutyna's death in a form that would be enforced by the Pension Plan; and (3) failing to obtain the Pension Plan's approval of either the PSA or another domestic relations order as a QDRO prior to Rutyna's death.

On cross-motions for summary judgment regarding Count I of the Complaint, the District Court denied Files's motion and granted the Pension Plan's.[9] At the outset, the District Court characterized Files's position as not seeking a survivorship benefit through her separate interest QDRO obtained by the Order *nunc pro*

[9]Although the District Court continued to exercise supplemental jurisdiction over the legal malpractice claims, a consent judgment was entered later against Rutyna's divorce counsel, and the remaining counsel defendants were dismissed, with the District Court retaining jurisdiction for enforcement of the consent judgment.

*tunc,* but instead as seeking to be paid the separate property interest awarded to her by the terms of the PSA. The Pension Plan argued that Files sought a property interest not provided for by law and was not entitled to survivorship benefits pursuant to ERISA in light of her counsel's failure to file the QDRO with the Pension Plan prior to Rutyna's death. The District Court agreed with the Pension Plan.

The District Court first determined that despite Files's assertion, the PSA did not meet the requirements of a QDRO. In the course of its reasoning, the District Court determined that Rutyna could not assign or alienate his benefits except through a QDRO pursuant to the REA, which amended ERISA's anti-alienation provision. 29 U.S.C. § 1056(d)(3)(A).[10] Next, the District Court determined that the PSA failed to meet the statutory requirements of a QDRO as set forth in 29 U.S.C. § 1056(d)(3)(B)-(D). Specifically, the District Court determined that the PSA failed to name Files as an

---

[10]That provision provides:

(d) Assignment or alienation of plan benefits
(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.
            *       *       *
(3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order [QDRO]. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

"alternate payee" as required by § 1056(d)(3)(B)(i)(I); did not detail the number of payments or pay period as required by § 1056(d)(3)(C)(iii); would require the Pension Plan to provide increased benefits as prohibited by § 1056(d)(3)(D)(ii); and did not designate Files as a surviving spouse as permitted by § 1056(d)(3)(F).

Relying on our decision in *Samaroo*, the District Court then affirmed the Pension Plan's refusal to honor the Order *nunc pro tunc*. The District Court characterized our holding in *Samaroo* as "where a PSA or divorce judgment does not create a survivorship right to pension benefits, a QDRO entered after the death of the plan participant also cannot do so," and further explained that per our *Samaroo* holding, the Order *nunc pro tunc* was not a QDRO because it violated the prohibition against requiring the Pension Plan to provide increased benefits "by providing for a survivorship interest in benefits that had lapsed after the participant's death." Accordingly, the District Court concluded that because it was undisputed that a QDRO was never filed with the Pension Plan and that Rutyna's benefits lapsed upon his death, any attempt by Files to obtain a *nunc pro tunc* amendment to the PSA must fail.

Second, the District Court rejected Files's argument that the Order *nunc pro tunc* was a "separate interest QDRO" which did not create survivorship interests, but rather reaffirmed that the PSA had granted Files a fifty percent property interest in Rutyna's pension that did not lapse upon his death.[11] The District Court viewed Files's

---

[11]As explained more fully within, we understand Files to be asserting that the PSA created her separate interest in Rutyna's pension at the time the PSA was entered and that the Order *nunc pro tunc* merely was her attempt to "qualify" that PSA as a QDRO acceptable to the Pension Plan as contemplated by 29 U.S.C. § 1056(d)(3).

16

arguments in this regard as an attempt to "do an end-run around the law, which required a QDRO . . . ." The District Court held that the Order *nunc pro tunc* "separate interest QDRO" could not be entered after Rutyna's death in light of our holding in *Samaroo.* Ultimately, the District Court determined that "[r]egardless of whether [Files] is claiming a survivorship right or not, the fact is that [she] is attempting to create a right to pension benefits which had lapsed after her ex-husband had passed and this right was not clearly provided for in a QDRO prior to his death or in the PSA."

Files initiated this timely appeal from the entry of summary judgment in favor of the Pension Plan, over which we exercise de novo review and apply the same standard as the District Court. *Samaroo*, 193 F.3d at 189. In that regard, the District Court properly applied a de novo standard of review regarding the Pension Plan's denial of Files's claim for pension benefits. 29 U.S.C. § 1056(d)(3)(G)(i)(II) requires only that the Pension Plan administrator make the initial determination of whether an order is a QDRO. *Id.* (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Whether either the PSA or the Order *nunc pro tunc* qualify as a QDRO under federal law are questions of statutory construction over which reviewing courts exercise de novo review. *Id.*

## III. Discussion

Files contends that the District Court erred in its application of our holding in *Samaroo.* In *Samaroo*, we held, limited to the facts before us in that case, that a *nunc pro tunc* state court order entered after the death of a pension plan participant and which awarded survivor benefits to the deceased participant's ex-wife was not a QDRO because an entitlement to survivor benefits under a pension plan must be determined as of the date of the plan participant's death.

17

Otherwise, given that the plan's pension obligations to its participant lapsed upon his death, a grant of survivor benefits *nunc pro tunc* made posthumously would result in increased benefit obligations to the plan. 193 F.3d at 190 and n.3. In contrast, Files asserts that her entitlement to fifty percent of Rutyna's Pension Plan benefits was fully established upon the New Jersey Court's adoption of the PSA in its July 16, 1998 Order, prior to Rutyna's death. Files does not seek survivor benefits from the Pension Plan nor did she create a new entitlement to pension benefits through the Order *nunc pro tunc*. According to Files, she sought the Order *nunc pro tunc* in an effort to meet the QDRO requirements in order to enforce her entitlement to fifty percent of Rutyna's pension as granted to her by the PSA. Indeed, Files premises her arguments regarding the District Court's assertedly erroneous application of *Samaroo* upon the fact that, in contrast to the facts in *Samaroo*, she possessed an entitlement pursuant to the PSA to fifty percent of Rutyna's pension prior to Rutyna's death.

The Pension Plan characterizes the issue here as whether Files could receive a share of Rutyna's pension under state law without first meeting ERISA's requirement that a QDRO, providing for a survivorship benefit, be submitted to the Pension Plan prior to his death. In an apparent attempt to place this case squarely within the limited holding of *Samaroo*, the Pension Plan characterizes the benefit sought by Files, through her submission to the Pension Plan of the Order *nunc pro tunc,* as a survivorship benefit that was not provided for in the PSA. If that were the case, as the Pension Plan asserts, *Samaroo* would control. But, as set forth below, we conclude that Files does not seek a survivorship benefit and that, therefore, *Samaroo* is not controlling.

Because the holding in *Samaroo* was expressly limited to its facts, our decision here is informed by a close review of those facts.

18

In *Samaroo*, the AT&T Management Pension Plan sought a declaration that the ex-wife was not entitled to the pre-retirement benefits of her ex-husband, who had died while still actively employed by AT&T.  In *Samaroo*, the divorce decree was silent as to the pre-retirement survivor's annuity, providing –

> (d)     Pensions, Profit Sharing and Bell System Savings Plan
>
> Savings Plan - - (1) Husband has a vested pension having a present value, if husband were to retire at this time, of $1,358.59 per month.  At the time of husband's retirement and receipt of his pension he agrees to pay to wife one half of said monthly amount.

*Id*. at 187.  When ex-husband died nearly three years later while still actively working for AT&T, and before reaching the qualifying age for pension payments, the pension benefit granted to the ex-wife and expressly provided for in the divorce decree never came to fruition.  Although the AT&T Pension Plan expressly provided for a pre-retirement survivor annuity for the surviving spouse of any Plan participant who died after vesting but before retiring, there was no annuity to be paid because there was no surviving spouse.  Not surprisingly, the AT&T Pension Plan denied the ex-wife's claim for the pre-retirement survivor annuity on the grounds that the DRO did not mention her entitlement to such rights and there was no pre-retirement survivor's annuity payable.   The ex-wife thereafter obtained a *nunc pro tunc* amendment to the divorce decree to create such an entitlement, providing her with "rights of survivorship to 50% of Husband's vested pension benefits."

19

On these facts, we held that the *nunc pro tunc* state court order was not a QDRO and further determined that enforcing the amended divorce decree would have resulted in an impermissible increase in plan benefits in violation of ERISA, 29 U.S.C. § 1056(d)(3)(D). We expressly limited our holding to the facts there before us, noting that elevating the *nunc pro tunc* order to QDRO status essentially would permit the participant to change the operative facts "after he has lost the gamble [on his longevity and retirement elections]" and "would wreak actuarial havoc on administration of the Plan." *Samaroo* at 190 and n.3.[12]

_____

[12]We reached our conclusion in *Samaroo* based in part upon concerns that permitting the ex-wife in that case to alter her benefits after the death of the plan participant essentially altered the actuarial computations relied upon by the plan given that the ex-husband died before becoming eligible to elect pension benefits. In that regard, we relied upon the reasoning set forth in *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153, 156 (4th Cir. 1997), where the United States Court of Appeals for the Fourth Circuit declined to give QDRO status to a state order granting an ex-wife surviving spouse benefits in order to collect past-due alimony from her ex-husband's pension. The *Hopkins* court recognized that defined benefit plans are based on actuarial calculations that would be rendered invalid if participants were allowed to change the operative facts retroactively. The participant in *Hopkins* had retired and began drawing on his pension in the form of a joint survivor annuity based on the lives of himself and his second wife. It was after he had begun drawing on this pension that his ex-wife obtained the state order declaring that she be treated as the surviving spouse. The Fourth Circuit held that the DRO was not a QDRO because the current wife's right to the survivor's benefits had already <u>vested </u>upon the plan participant's retirement. *Id*. at 156-57. But, the key distinction between *Hopkins* and Files's claim is that in *Hopkins*, there was an

20

The operative distinction between the facts here versus *Samaroo* is the type of benefit awarded to the ex-wives in the property settlements within the respective divorce decrees. Although the issue of whether the divorce decree itself met ERISA's QDRO requirements was not before us in *Samaroo*, we nevertheless noted the problems with granting that decree QDRO status, and our statements in that regard are instructive to our analysis of the instant case. First, in *Samaroo*, we determined that the decree evidenced an intention to divide only property rights existing at the time of the divorce, not an intention to give the ex-wife an interest in post-divorce earnings. *Samaroo*, 193 F.3d at 188 n.2. Second, we concluded that the decree only gave the ex-wife an entitlement to benefit payments when they were paid to the participant rather than "conveying to her a portion of . . . [ex-husband's] interest in the Plan." *Id*. In contrast, the PSA here conferred upon Files a fifty percent interest in Rutyna's pension; in other words "conveying to her a portion of . . . [husband's] interest in the Plan" not limited to property rights existing as of the date of the divorce. *See id*. There was no question that Files could have enforced her right to receive that fifty percent interest on or after Rutyna's fiftieth birthday (the date the pension became payable), separate and apart from Rutyna's election regarding the remaining fifty percent. We conclude that Files possessed a separate interest in fifty percent of Rutyna's pension as of the July 16, 1998 PSA.

---

attempt to divest benefits already vested in a subsequent spouse, whereas here, there was no such vesting, and therefore, no such disruption to actuarial planning. *See also Singleton v. Singleton*, 290 F. Supp. 2d 767 (W.D. Ky. 2003) (following *Hopkins* in preventing first wife, who never put plan on notice of QDRO, from displacing second wife as the surviving spouse as those benefits vested in second wife upon husband's retirement).

Armed with this conclusion, we now turn to the question of whether Files undertook appropriate steps to enforce her interest in Rutyna's pension benefits in light of the Pension Plan's contention that Rutyna's death, in the absence of a QDRO providing for survivorship benefits, caused his pension to lapse. Nothing in ERISA requires that the Pension Plan must have been notified of Files's interest in fifty percent of Rutyna's pension prior to his death in order for Files to engage in the process, contemplated by ERISA, of "qualifying" the PSA as a QDRO to enforce her already-existing property interest. *See Trs. of Directors Guild of Am. Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 421, *as amended upon denial of reh'g*, 255 F.3d 661 (9th Cir. 2000) (where child support order was converted to a QDRO *nunc pro tunc* after the death of plan participant, court reasoned there was nothing in ERISA requiring that a QDRO must be finalized before benefits become payable). As was recognized by the United States Court of Appeals for the Ninth Circuit in *Tise*, the detailed QDRO requirements set forth in ERISA are devoid of any requirement that a QDRO be in place before plan benefits reach pay status under the plan. *Id*. at 421. Nor do the QDRO provisions of ERISA suggest that the alternate payee has no interest in plan benefits until she obtains a QDRO; rather, they merely prevent enforcement of that already-existing interest until the QDRO is obtained. *Id*. (citing *In re Gendreau*, 122 F.3d 815, 819 (9th Cir. 1997), *cert. denied*, 523 U.S. 1005 (9th Cir. 1997)). In *Gendreau*, the Ninth Circuit considered whether the husband/plan participant could, by filing for bankruptcy, prevent his ex-wife from obtaining a QDRO giving effect to a divorce decree that awarded her fifty percent of his pension. The court concluded that the ex-wife's interest was created upon entry of the state order, which thereby also limited the husband's interest. These respective interests in the plan were not altered merely because the divorce decree did not meet the statutory requirements for a QDRO. 122 F.3d at 819. What was required was for the ex-wife to obtain a revised state court order that met the

22

QDRO requirements in order to enforce the property interest conferred upon her by the divorce decree; the QDRO only related to enforcement of an already defined interest. *Id.* The court further recognized that it was precisely because obtaining a QDRO is a time-consuming process that ERISA recognizes periods where the status of a QDRO is at issue. *Id.* Similarly, we conclude that nothing in the statutory language precluded Files from pursuing a QDRO after Rutyna's death to enforce her previously existing fifty percent interest in Rutyna's pension. Despite the Pension Plan's argument that all pension benefits lapsed upon Rutyna's death because there was no QDRO, Files's pursuit of a QDRO posthumously comes within the ambit of the "qualification" process contemplated within 29 U.S.C. § 1056(d) as she simply seeks to enforce an interest created prior to Rutyna's death.

Indeed, the statutory QDRO requirements expressly contemplate a "qualification" process by which plans, once on notice of a state court DRO, will determine whether a state court DRO is sufficient to alter existing plan obligations. *See* 29 U.S.C. §§ 1056(d)(3)(H)(i)-(v). This "qualification" process commences with a plan's notice of the DRO. The statute expressly states that once a plan receives a DRO, within "a reasonable period," the administrator shall determine whether that order is a QDRO, *see* 29 U.S.C. § 1056(d)(3)(G)(i)(II), and that each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders, *see* 29 U.S.C. §§ 1056(d)(3)(G)(ii)(I)-(III). Thus, the statute contemplates and the plan establishes the "process" by which a DRO is "qualified." Essential to this "qualification" process is the statutory requirement that the plan take steps to ensure the preservation of benefits that are otherwise payable while the determination of QDRO status is undertaken. *See Tise,* 234 F.3d at 421-22; 29 U.S.C. § 1056(d)(3)(H)(i) ("[d]uring any period in which the issue of whether a domestic relations order is a . . . [QDRO] . . .

23

the plan administrator shall separately account for the amounts . . . which would otherwise have been payable to the alternate payee . . . ."). In that regard, during the first eighteen months after which benefits become payable, the plan must segregate the benefits potentially payable to the alternate payee. 29 U.S.C. § 1056(d)(3)(H)(v). Moreover, ERISA contemplates further state court proceedings during the eighteen-month QDRO determination period in which the alternate payee can cure defects in the original DRO by obtaining modification to the original DRO in order to enforce it as a QDRO. *Tise*, 234 F.3d at 422 (citing 29 U.S.C. § 1056(d)(3)(H)(ii) ("[i]f within the 18-month period . . . the order (or modification thereof) is determined to be a . . . [QDRO] . . . .")). It is only after this eighteen-month period has expired that the putative alternate payee loses the right to uphold payment of plan proceeds to a designated beneficiary. *Id*. (citing 29 U.S.C. § 1056(d)(3)(H)). And even then, if the DRO ultimately is "qualified" as a QDRO, the obligations thereunder shall be applied prospectively. *See* 29 U.S.C. § 1056(d)(3)(H)(iv).

We now turn to when the "qualification" process was triggered by notice to the Pension Plan of the PSA. Significantly, the Pension Plan's own policies and correspondence thwart its current assertion that it lacked notice of the PSA prior to Rutyna's death. ExxonMobil's own policy as communicated to plan participants (and presumably those seeking QDROs) provided that a block is placed on both the savings and pension accounts until a QDRO or other documentation is received by the Plan. Specifically, the "Information About Thrift and Annuity Plan Benefits as Part of the Divorce Process" provided that "[o]nce Exxon's Benefits Accounting or Benefits Administration Office receives written notice of a divorce (either pending or final), . . . [Savings] and . . . [Pension] Plan benefits will generally be 'blocked.'" Consistent with this policy and the statutory mandate, the Savings Plan segregated Rutyna's savings

24

account in response to the August 16, 2000 letter from Rutyna's divorce counsel notifying it of the divorce. The record as to the segregation of the pension account, however, is not as clear. According to Files, as early as August 29, 2000, the Pension Plan indicated in correspondence to Rutyna's divorce counsel that both Rutyna's savings and pension accounts had been "blocked."[13] The Pension Plan, however, subsequently clarified that the "block" pertained only to the savings account. But, consistent with Files's position, Mr. Leis testified that once on notice of a divorce, the Pension Plan generally would segregate pension benefits to ensure that the funds were paid to the proper recipient (*see supra*. n.4). Against this backdrop, we conclude that it is disingenuous for the Pension Plan to assert that lack of notice of the DRO caused Rutyna's pension benefits to lapse upon his death. We find persuasive the fact that consistent with its own policies, at least one of the ExxonMobil plans deemed the August 16, 2000 letter sufficient notice to require segregation of plan assets.

Even if we look to April 6, 2001, the date of the correspondence by which the Pension Plan was provided with an actual copy of the PSA, this notice standing alone triggered the "qualification" process for Files to enforce her rights under the PSA despite the fact that it was provided after Rutyna's death.[14] Files's

---

[13]Notably, that August 29, 2000 correspondence is not in the record; rather, it is referenced within correspondence which is before us.

[14]We reiterate that ERISA does not prescribe a time frame as to when, in relation to the state court's entry of a domestic relations order, the plan must be presented with a copy of the domestic relations order so-entered in order to trigger the QDRO process. Rather, ERISA only provides that the "qualification" process is

25

counsel furthered the process by providing the Pension Plan with copies of the proposed Order *nunc pro tunc* on August 9, 2001 and the February 7, 2002 Order *nunc pro tunc* on February 28, 2002. The Pension Plan's response to its receipt of the Order *nunc pro tunc* reveals that the Pension Plan still was "qualifying" the PSA as a QDRO. Although the Pension Plan's May 30, 2002 letter to Files's counsel indicated that it would not "continue the appeal to consider the property settlement as a domestic relations order when the court has entered a subsequent one which was submitted for consideration," the Order *nunc pro tunc* was Files's attempt to "qualify" the PSA by addressing the Pension Plan's stated concerns to date regarding its recognition of the PSA as a QDRO.

Ultimately, it matters not whether we deem the Pension Plan on notice prior to Rutyna's death given its policies and the benefit segregation undertaken by the Savings Plan, or after Rutyna's death, when it received the PSA in April 2002. Regardless of notice, we reach the same conclusion – that Files simply engaged the statutorily contemplated process to "qualify" the PSA as a QDRO in order to enforce pre-existing rights. Nothing in the statute, or in our precedent, requires that a QDRO be in place prior to the death of a plan participant when the QDRO that is ultimately obtained by engaging the statutory process simply seeks to enforce a separate interest in a pension benefit that existed before the death of the plan participant. *See Tise,* 234 F.3d at 421; *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153-54 (10th Cir. 2003) (upholding a *nunc pro tunc* DRO issued eleven years after a divorce decree pertaining to plan benefits from a plan not known about at the time of the divorce, and declining to infer that the plan must have been notified of the interest prior to the death of the participant); *Hogan v. Raytheon Co.*, 302

triggered by "notice" to the plan of the state court domestic relations order.

26

F.3d 854, 857 (8th Cir. 2002) (permitting posthumous qualification of a DRO because during husband-participant's life, plan was provided with a copy of divorce decree awarding ex-wife fifty percent of husband-participant's present retirement funds, and DRO obtained subsequent to husband-participant's death designating ex-wife as alternate payee for purposes of survivorship benefits was done within the eighteen month period permitted to secure a QDRO).

## IV. Conclusion

Based on the foregoing, we will reverse the order of the District Court and remand for further proceedings consistent with this opinion.