**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 23 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

BARBARA A. PATTON, formerly known as
Barbara A. Phipers,

      Plaintiff-Appellee,

v.

THE DENVER POST CORPORATION;
DENVER POST-DENVER GUILD PENSION
PLAN,

      Defendants-Appellants.

No. 02-1040

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 00-K-1860)**

---

Michael J. Hofmann (Mary Hurley Stuart with him on the briefs) of Holme Roberts
& Owen LLP, Denver, Colorado, for Defendants-Appellants.

Daniel S. Hoffman of Hoffman Reilly Pozner & Williamson, LLP, Denver,
Colorado (Mary J. Kelly of Mary J. Kelly, P.C., Denver, Colorado, with him on the
brief), for Plaintiff-Appellee.

---

Before **SEYMOUR**, **McKAY** and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Eleven months after the death of Barbara Patton's former husband William Todd Phipers, Ms. Patton sought a declaration in federal court that a state domestic relations order granting her survivor benefits in her former husband's pension plan was a "qualified domestic relations order" (QDRO) under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1056(d)(3). The state court had entered the domestic relations order after Mr. Phiper's death, but *nunc pro tunc* to the date of their divorce eleven years prior to his death, because it concerned benefits from a plan not known about at the time of the divorce settlement. The district court granted Ms. Patton's motion for summary judgment in a published decision. *Patton v. Denver Post Corp.*, 179 F. Supp. 2d 1232 (D. Colo. 2002). The Denver Post Corporation and the Denver Post-Denver Guild Pension Plan (collectively, "the Denver Post") challenge that decision, contending the order was not a "qualified" domestic relations order under ERISA because it increases the liability of the plan and because it was not in existence as of the date of the participant's death. We affirm.

**I**

The marriage of Mr. Phipers and Ms. Patton was dissolved on February 10, 1988. During the mediation related to the dissolution of their marriage, the parties voluntarily produced financial information. In this regard, Mr. Phipers wrote to

-2-

request information from his employer, the Denver Post, regarding his retirement benefits. In response to his inquiry, the plan administrator informed him of only one plan, the Newspaper Guild International Pension Plan, although in fact at that point he had two plans. There is no indication of an attempt on anyone's part to conceal the existence of the second plan, but the Denver Post Pension Plan was nevertheless inadvertently omitted from the parties' division of marital assets. The parties divided the one disclosed plan in a QDRO, in which Ms. Patton was designated as surviving spouse in the event of Mr. Phipers' death. Ms. Patton's interest in the disclosed plan was one half of the plan's value attributable to the thirteen years of the parties' marriage.

Mr. Phipers died in 1999 at the age of 58. He died before retirement age and while still employed at the Denver Post. Under these circumstances, ERISA provides that retirement plan benefits can only be paid to a surviving spouse. 29 U.S.C. § 1055(a)(2). Mr. Phipers had not remarried, so at the time of his death only Ms. Patton qualified as his surviving spouse under ERISA. 29 U.S.C. § 1056(a)(3)(F)(i). Ms. Patton filed with the plan administrator her QDRO covering the disclosed plan and received a lump sum payout, which appeared to her to be very low considering Mr. Phiper's twenty-seven years of service. When she inquired about this, she learned of the undisclosed plan.

The plan administrator refused to divide the undisclosed plan according to

the terms established in the QDRO for the disclosed plan, even though the plans had since merged into one. Believing the nondisclosure of the second plan to have been inadvertent, Ms. Patton requested the state court to issue a *nunc pro tunc* domestic relations order for the undisclosed plan. She asked that the second plan be divided in the same way as the disclosed plan had been. The state court entered the *nunc pro tunc* order, effective on the date of the dissolution of the parties' marriage.

A domestic relations order must be qualified by the plan administrator in order to become a QDRO and in order for the benefits to be distributed according to the terms of the QDRO. When Ms. Patton presented the *nunc pro tunc* order to the plan administrator, however, the plan administrator rejected it. Ms. Patton then filed for a declaratory judgment in federal district court, requesting enforcement of the order and distribution of the benefits. The Denver Post appeals the district court's grant of summary judgment in favor of Ms. Patton.

**II**

We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate if there is no genuine issue of material fact and

the moving party is entitled to a judgment as a matter of law. *Id.*

We note at the outset that counsel for the two parties made conflicting representations at oral argument as to whether ERISA requires that notice of the entry of a QDRO be given to the plan administrator (i.e., whether the QDRO itself must be in the plan file) prior to the death of the participant. Neither side, either in the briefs or at oral argument, provided any specific citation to support its assertion. Nor have we been able to discover any part of the statute itself or any interpretation of the statute in case law or secondary scholarly materials demonstrating to us that the statute requires such notice to be given. *See, e.g.*, Gary A. Shulman, *Qualified Domestic Relations Order Handbook* 54 (1993) ("Under ERISA or § 414(p) of the Code, there is no requirement that a domestic relations order be prepared or submitted either at the time of divorce or at any other particular time.")

The Denver Post asks us to infer a notice requirement, asserting the policy interests of ease of administration, predictability, and actuarial accounting. We decline to infer such a requirement. First, the plan summary does not indicate that notice is required prior to the death of a participant, either concerning a change in marital status or concerning the existence of a domestic relations order relevant to the plan. Second, the Denver Post concedes the plan allows for post hoc determinations of whether the domestic relations order is qualified (this much is

explicitly allowed by the statute[1]), as well as post-death notification of the existence of an actual surviving spouse. That is, if there were an actual surviving spouse of which it had no notice prior to the death of the participant, failure to notify the Denver Post of the spouse's existence in advance would not prevent the surviving spouse from receiving benefits. There is thus no difference to the Denver Post in terms of predictability of its liability if there is no requirement that the parties inform the plan of any change prior to the death of the participant. Because the statute and the plan itself both clearly contemplate making decisions regarding benefits after the death of the participant, the Denver Post's arguments about predictability and actuarial calculations lack weight.

### III

The domestic relations order in this case is a qualified domestic relations order because it fits within the requirements of ERISA. ERISA requires that in order to be "qualified," a domestic relations order may not provide a type or form of benefit or an option not otherwise provided by the plan, require the plan to provide increased benefits, or divest a beneficiary under an earlier established

---

[1] For eighteen months from the date on which a payment would first have been due, the decision about qualified status of a domestic relations order is retroactive. After eighteen months it is effective prospectively only, but there is no indication of a limitation on the time for making a decision past eighteen months. 29 U.S.C. § 1056(d)(3)(H)(I)-(v).

QDRO. 29 U.S.C. § 1056(d)(3)(D)(i)-(iii). Neither side argues that the domestic relations order in this case divests any other beneficiary so we look to the other two requirements. While this case only purports to raise an argument regarding provision of increased benefits, analysis of the "not otherwise provided" requirement is also pertinent.

Under the interpretation of this section of the statute in *Payne v. GM/UAW Pension Plan Adm'r*, No. Civ.A. 95-CV-73554DT, 1996 WL 943424 (E.D. Mich. May 7, 1996), which we find persuasive, there is no increase in liability or benefits.[2]  In *Payne*, the former wife sought pension benefits pursuant to the terms of a divorce granting her a forty-five percent interest in her former husband's plan. The divorce decree stated that a QDRO would issue within thirty days, but the husband died before the entry of the QDRO. The plan rejected the posthumously entered order as a QDRO because it maintained that no provision of the plan allowed for establishment of surviving spouse after the death of the participant. It argued that allowing for such would provide a benefit not otherwise provided in the plan, in violation of ERISA § 1056(d)(3)(D)(i). The court noted that the plan could not point to a provision requiring notice to the administrator prior to death,

---

[2] Plaintiff relies on this unpublished opinion.  Under 10th Cir. R. 36.3(B), we cite an unpublished decision only if it has persuasive value with respect to a material issue that has not been addressed by us in a published opinion and it assists us in our disposition.  Both requirements are met with regard to this case.

and provided no authority for its proposition that a post-death amendment is invalid. Because the order was amended *nunc pro tunc*, the court held it was to be considered entered before the death of the participant and thus did not provide a benefit not otherwise provided. *Payne*, 1996 WL 943424 at *8.

*Payne's* analysis recognizes the validity of the state court's use of the *nunc pro tunc* doctrine to amend a QDRO. We are persuaded that if that is true for § 1056(d)(3)(D)(i), it is true as well for § 1056(d)(3)(D)(iii). Because the *nunc pro tunc* order in the present case must be considered to have been entered before the death of the participant, it does not increase the benefits to be paid.

Our conclusion that the domestic relations order in this case did not confer different or increased benefits as prohibited by § 1056(d)(3)(D)(i)-(iii) is supported by solid case law and secondary materials. For example, benefits of a type or form not otherwise provided is best understood as referring to a lump sum payout rather than regular payments over a period of years. *See, e.g.*, *Dickerson v. Dickerson*, 803 F. Supp. 127, 134 (E.D. Tenn. 1992); *see also* Shulman, *Qualified Domestic Relations Order Handbook* at 27. As to the meaning of an increase, case law similarly confirms that the increase must be real rather than conceptual. *Bailey v. New Orleans Steamship Ass'n*, 100 F.3d 28 (5th Cir. 1996). In *Bailey*, a former spouse sought a portion of her former husband's benefits (half of which were already being distributed to his subsequent wife). The court determined that

while it was theoretically possible that the benefits would have been greater in such a situation, in fact, due to the life expectancies of the two women, the benefits would be lessened with the addition of the former wife and the domestic relations order would therefore not be disqualified. Here, Ms. Patton has not asked to receive funds in any manner different from that allowed for in the plan. Nor will she receive more benefits than she would have received if the second plan had been included in the original order.

Other cases allow for the post-death entry of an order, noting that such entry occurred within the eighteen months prescribed by the statute for determining whether a plan is qualified, *see supra* at n.1. In *Hogan v. Raytheon, Co.*, 302 F.3d 854, 857 (8th Cir. 2002), the court held that a domestic relations order can be qualified posthumously. While *Hogan* noted that the plan had notice a QDRO might issue, such notice was not essential to its determination of the order's validity. *Id.* Instead, the court held "[t]he fact that Mr. Hogan died prior to the entry of the . . . Order is irrelevant." *Id.*

The Denver Post acknowledges that *nunc pro tunc* orders have a legitimate place in state law, but it maintains they cannot be used to rewrite historical facts. The *nunc pro tunc* order here does not attempt to rewrite historical facts. Rather, it is more akin to the correction of a clerical error, which is an accepted use for *nunc pro tunc* orders. All that occurred in this case is that the state court and the

-9-

parties previously lacked full information as to the assets to be distributed in the divorce settlement. When those assets were finally discovered, the court simply allotted them as it had intended under the original plan, i.e., as it would have done had it been aware of their existence at the time. The historical facts were not changed – two pension plans existed on the date of the divorce as well as the date of death. That is, once discovered, the second plan simply was added to the list of assets and apportioned so as to achieve the same equitable division of marital assets originally intended by the domestic relations court. No other person's vested interest was upset by this action.

Moreover, as to the Denver Post's argument that the domestic relations order did not exist before the date of the participant's death, the very point of a *nunc pro tunc* order is the creation of a legal fiction that the order *did* exist as of the date to which it is made effective. That fiction is one which has been accepted in Colorado as a basic doctrine of law, such that its fictional quality does not diminish its binding effect. *See Estate of Becker v. Becker*, 32 P.3d 557, 559 (Colo. Ct. App. 2000) ("Court orders entered *nunc pro tunc*, or "now for then," are normally for the purpose of correcting an omission from the court records and are deemed to have retroactive effect."). *See also*, *e.g.*, BLACK'S LAW DICTIONARY 1097 (7th ed. 1999); C.P. Jhong, Annotation, *Entering Judgment or Decree of Divorce Nunc Pro Tunc*, 19 A.L.R.3d 648 (1968).

The Denver Post advocates the position taken by the majority of a Third Circuit panel in *Samaroo v. Samaroo*, 193 F.3d 185 (3d Cir. 1999). The court held that a beneficiary's entitlement had to be established as of the day the participant died. It reasoned that a *nunc pro tunc* order entered after that date, even though back-dated to a date prior to death, was an attempt to obtain increased benefits and therefore could not be a QDRO. Based on our earlier analysis, we disagree. The holding in *Samaroo* "work[s] an unwarranted interference with the states' ability to administer their domestic relations law and to effectuate equitable divisions of marital assets." *Id.* at 192 (Mansmann, J., dissenting). In dissent, Judge Mansmann noted, as we have, that the holding in *Samaroo* was not compelled by statute or case law, *id.*, nor was there a policy argument sufficiently weighty to overcome the propriety of using the *nunc pro tunc* doctrine in these types of cases, *id.* at 193-94.

We are further persuaded of the correctness of our decision by an article from the periodical of the ABA's Family Law Section, written by Gary Shulman, author of the *Qualified Domestic Relations Order Handbook*. Mr. Shulman writes:

> Nunc pro tunc QDROs are desperately needed in the domestic relations arena. There must be a way to secure a former spouse's property rights to a pension that could suddenly disappear as a result of a technicality or a family law attorney's inexperience in drafting QDROs.

Gary Shulman, *QDROs – The Ticking Time Bomb*, 23 FAMILY ADVOCATE 26, 29

(2001).

In sum, this is precisely the type of situation, particularly in the domestic relations arena, for which the *nunc pro tunc* doctrine is appropriate.[3] Courts in domestic relations contexts must have the power to effect equitable settlements by responding to newly acquired information or to changes in circumstances. If necessary changes once effected by the state court are not then recognized by plan administrators or by federal courts adjudicating disputes, state courts are effectively stripped of their ability to equitably distribute marital assets in a divorce.

Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of Ms. Patton.

---

[3] Due to its disclosure of only one plan, the Denver Post itself was arguably responsible in part for Ms. Patton's need to amend the divorce order after her ex-husband's death. Although there is no indication the omission was intentional, responsibility for the error still lies at least in part with the plan administrator who provided the partial information. We note, however, that the plan's negligence in disclosure is not an essential element of the analysis for this type of claim.