172 Cal.App.4th 830 (2009)
In re the Marriage of BEVERLY and ROBERT J. PADGETT.
BEVERLY PADGETT, Respondent,
v.
DONNA LITTLE, as Personal Representative, etc., Appellant;
AUTOMOTIVE INDUSTRIES PENSION PLAN, Respondent.
No. A120644.
Court of Appeals of California, First District, Division Two.
March 25, 2009.
*836 Luce, Forward, Hamilton & Scripps, Charles A. Bird; Peggy L. Bennington, a Professional Corp., Peggy L. Bennington; Law Offices of Barbara A. Ginsberg and Barbara A. Ginsberg for Appellant.
Ryan A. Kent and Kenneth S. McFarlan for Respondent Beverly Padgett.

OPINION
KLINE, P. J. 

INTRODUCTION
Donna Little, the widow of Robert Padgett and the personal representative of his estate, appeals the trial court's entry of a final qualified domestic relations order (QDRO) enforcing the interest of Robert's former spouse, Beverly Padgett, in Robert's pension plan, following the court's nunc pro tunc entry of an order dividing Robert's pension plan survivor's benefit as a community asset in their 1988 dissolution.[1]
Donna contends that surviving spouse benefits irrevocably vested in her at Robert's death. She further contends the antialienation provision of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.[2]; ERISA) prevented the court from ordering the pension plan to pay part of the survivor's benefit to Beverly where Beverly took no steps to inform the pension plan of her community property claim until after Robert died, before his retirement and while married to Donna.
We shall conclude that, where the plan participant dies or retires before the former spouse secures an order awarding that spouse any interest in the pension plan, a domestic relations order entered before the plan participant's death that does not award the former spouse an interest in the participant's pension plan but simply "reserves jurisdiction" over the plan provides an inadequate basis for entry nunc pro tunc of either a QDRO or of an order determining the former spouse's interest in the pension plan that later may be qualified as a QDRO. We shall therefore reverse the trial court's order.

I. Background
Robert and Beverly were married on June 11, 1972. They had two children. They separated on August 15, 1985, and the court entered a judgment of *837 dissolution on March 14, 1988, nunc pro tunc to December 31, 1987. Beverly had counsel. While married to Beverly, Robert worked as a mechanic and was a participant in the Automotive Industries Pension Plan (the Plan). The judgment of dissolution did not adjudicate Beverly's interest in Robert's pension plan, but the court expressly retained jurisdiction to do so. The sole reference to Robert's pension is contained in paragraph 4 of the judgment of dissolution as follows: "Husband's Pension Plan: The court shall reserve jurisdiction over husband's pension plan."
Robert married Donna on March 3, 1995. They had one child. Robert continued to work in positions that added to his potential benefits from the Plan. Robert died on January 26, 2005, before he had retired and before receiving any benefits from the Plan. The Plan provides a survivor's benefit of half of the monthly pension benefit Robert would have received if he had retired immediately before his death. Donna became the personal representative of his estate.
During Robert's lifetime, Beverly took no steps to notify the Plan of her community property claim and did not seek to obtain an order giving her an interest in pension benefits or a QDRO in connection with the court's reservation of jurisdiction. At no time before Robert's death did Beverly or her attorney communicate with the Plan in writing or provide the Plan with a copy of the judgment of dissolution. Beverly stated she did not know that she had to do anything until Robert retired and benefits became payable.
In February 2005, after Robert's death, Beverly contacted the Plan and advised that she was making a claim for benefits payable under the Plan. The Plan informed her the domestic relations order contained in the judgment of dissolution was not a proper QDRO. The Plan notified both Beverly and Donna, alerting them to the possibility of a conflict between them relating to their possible claims to survivor benefits. The Plan took no position on the dispute. It withheld from payments to Donna its estimate of the sums payable to Beverly should her claim be determined to be valid, and offered to interplead the issue. On March 21, 2006, the Plan advised the parties that it intended to segregate $300.32 per month, representing an estimated amount that might be assigned by the court to Beverly were the court to determine that she had a QDRO.
On July 12, 2006, Beverly applied ex parte to the superior court for a QDRO. The court entered the order. The order was vacated pursuant to a stipulation of the parties, because Donna had not been noticed and had not *838 appeared in the action until she joined in the stipulation to vacate the order. In November 2006, the Plan was joined in the action. Beverly moved to divide the Plan survivor's benefit as an unadjudicated community asset and to have the requested QDRO made effective nunc pro tunc to a date before Robert's death. Donna opposed the motion.
On April 24, 2007, the superior court adopted its tentative ruling, granting Beverly's motion, declaring that Beverly was not required to obtain a QDRO before Robert's death and that she was not required to notify the Plan of her community property claim to Plan benefits before his death. The court directed further adjudication of Beverly's exact community interest according to a formula it set forth in the order based upon the length of her marriage to Robertallocating to her a portion of the survivor's benefitsand ordered Beverly's attorney to prepare a proposed QDRO, nunc pro tunc as of March 14, 1988, consistent with its ruling and in compliance with ERISA, and to serve it on the Plan. The Plan was ordered to advise Beverly by May 4, 2007, whether it accepted the proposed QDRO and, if not, why not.[3] The court retained jurisdiction to implement the ruling and the judgment filed March 14, 1988.
Donna appealed from the April 24, 2007 order. On August 8, 2007, we dismissed the appeal as from a nonappealable order. (In re Marriage of Padgett (Aug. 8, 2007, A117991) [nonpub. opn.].)
On December 14, 2007, the superior court entered the QDRO pursuant to Family Code, division 6, part 1, chapter 6 (Employee Pension Benefit Plan as Party). The QDRO provisions were consistent with the court's previous order dividing the survivor benefits as an unadjudicated community asset, effective nunc pro tunc as of March 14, 1988, assigning from Donna to Beverly "the right . . . to receive Surviving Spouse Benefits payable under the Plan in an amount equal to half of the community's interest in the Surviving Spouse Benefits payable under the Plan." It further identified the annuity starting date of payments to the alternate payee (Beverly) as February 1, 2005. The court retained jurisdiction, if necessary, to amend the QDRO and the judgment of dissolution to establish its qualifications as a QDRO, and to implement Beverly's right to receive surviving spouse benefits under the plan.
Donna timely appealed the court's entry of the QDRO.

*839 II. Standards of Review and Overview of ERISA's QDRO Provision
(1) The interpretation of ERISA, including whether ERISA preempts state law, is a question of law which we review de novo. (Carmona v. Carmona (9th Cir. 2008) 544 F.3d 988 (Carmona).) "[T]he decisions of the lower federal courts, although entitled to great weight, are not binding on state courts. `[T]he decisions of the lower federal courts on federal questions are merely persuasive. . . . Where lower federal court precedents are divided or lacking, state courts must necessarily make an independent determination of federal law.' (Rohr Aircraft Corp. v. San Diego (1959) 51 [Cal.]2d 759, 764 [336 P.2d 521].) [Citations.]" (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 506, pp. 569-570.)
Two recent Ninth Circuit decisions, Carmona, supra, 544 F.3d 988 and Hamilton v. WA State Plumbing Pension Plan (9th Cir. 2006) 433 F.3d 1091 (Hamilton), provide an overview of the ERISA statutory framework relevant to the questions presented here. We therefore quote them at length: "Congress originally enacted ERISA to protect the rights of workers who earn pension benefits and to encourage plan participation. PAUL J. SCHNEIDER, BRIAN M. PINHEIRO, ERISA: A COMPREHENSIVE GUIDE § 1.02 (3d ed.2008). In addition to protecting plan participants, Congress also sought to protect plan beneficiaries. See Boggs v. Boggs, 520 U.S. 833, 845, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). In order to meet those ends Congress enacted an intricate, comprehensive statute that governs both pension and welfare plans. Id. at 841, 117 S.Ct. 1754. ERISA pension plans must comply with participation, vesting, and funding requirements. Id." (Carmona, supra, 544 F.3d at pp. 997-998.)
(2) "ERISA contains an anti-alienation provision and a preemption provision that restrict the ability of state courts and plan participants to transfer and alter interests in ERISA-governed retirement benefits. See 29 U.S.C. § 1056(d)(1) (`Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.'); 29 U.S.C. § 1144(a) (establishing that ERISA `supercede[s] any and all State laws insofar as they may . . . relate to any employee benefit plan . . . .'). Despite this broad preemption and anti-alienation scheme, Congress has recognized that states, in some circumstances, should be able to enforce their own domestic relations laws with respect to ERISA pensions. As a result, state domestic relations orders (`DROs') that comply with statutory requirements are exempt from both the anti-alienation and preemption provisions of ERISA. 29 U.S.C. § 1144(b)(7); 29 U.S.C. § 1056(d)(3); Hamilton, 433 F.3d at 1096 n. 5." (Carmona, supra, 544 F.3d at p. 998.)
*840 "More recently, Congress further refined the statutory framework with the Retirement Equity Act of 1984 (`REA'), Pub.L. No. 98-397, 98 Stat. 1426, which particularly sought to protect the rights of surviving spouses." (Carmona, supra, 544 F.3d at p. 998.)
(3) "The [REA] Pub.L. 98-397, 98 Stat. 1426, amended ERISA in two important ways with respect to surviving spouses. REA first sought to `ensure a stream of income' to surviving spouses by requiring pension plans to provide automatic surviving spouse benefits. Boggs, 520 U.S. at 843, 117 S.Ct. 1754. Section 1055, as amended by REA, provides that if a vested participant dies before the annuity start date, leaving a surviving spouse to whom he has been married for at least one year, `a qualified preretirement survivor annuity [QPSA] shall be provided to the surviving spouse.'[4] 29 U.S.C. § 1055(a)(2). The QPSA is an annuity for the life of the surviving spouse that must be at least fifty percent of the annuity amount which would have been payable during the joint lives of the participant and spouse. Id. at § 1055(e)(2). Provision of the QPSA may be waived by the participant only if the spouse consents in writing to the designation of another beneficiary. Id. at § 1055(c)(2)." (Hamilton, supra, 433 F.3d at p. 1095, final fn. omitted.)
"REA also introduced the QDRO exception [§ 1056(d)] which `elevates a plan participant's legal obligations, commonly to a former spouse or children of a previous marriage, over the participant's express wishes to provide for other individuals as designated beneficiaries.' [Citation.] The QDRO is a subset of `domestic relations orders' that recognizes the right of an alternate payee to `receive all or a portion of the benefits payable with respect to a participant under the plan.' 29 U.S.C. § 1056(d)(3)(B)(i)(I)." (Hamilton, supra, 433 F.3d at p. 1096; accord, Carmona, supra, 544 F.3d at pp. 998-999.) "[T]he statute specifically contemplates the assignment of surviving spouse rights (i.e., a QPSA) to a `former spouse' in a QDRO . . . ." (Hamilton, at p. 1096, citing § 1056(d)(3)(F)(i).) "In crafting the QDRO exception, `Congress resolved any uncertainty concerning the authority of state courts to adjudicate marital dissolutions and to affect ERISA pension plan benefits.' [Citation.]" (Hamilton, at p. 1096, fn. omitted.) In other words, through the QDRO vehicle, the REA (Retirement Equity Act of 1984; Pub.L. No. 98-397, *841 98 Stat. 1426) amended ERISA to create a mechanism whereby a participant's former spouse is entitled to be treated as the "current" spouse for purposes of receiving surviving spouse benefits.
(4)"Although state courts, via DROs, may create enforceable interests in the proceeds of an ERISA plan, there are limitations on the ability of state courts to create enforceable property interests in alternate payees. See Trs. of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise, 234 F.3d 415, 420 (9th Cir. 2000) [amended (9th Cir. 2001) 255 F.3d 661]. First, in order for a DRO to be considered a QDRO, the state courts must fulfill certain specificity requirements. These requirements allow a plan administrator to more easily administer the plan and reduce the risk of making improper payments. See Hamilton, 433 F.3d at 1096-97 (citing In re Gendreau, 122 F.3d 815, 817-18 (9th Cir.1997)). A DRO meets the requirements of a QDRO and thus is enforceable only if the order `clearly specifies' (1) the name and mailing address of both the participant and the alternate payees, (2) the amount or percentage of the participant's benefits to be paid to each alternate payee, (3) the number of payments to which the order applies, and (4) the plan to which the order applies. 29 U.S.C. § 1056(d)(3)(C). If the state court fails to substantially comply with the statutory QDRO requirements, even a valid domestic relations order is not enforceable against a pension plan. See Hamilton, 433 F.3d at 1097." (Carmona, supra, 544 F.3d at p. 999, fn. omitted.)
(5)"Second, the DRO itself must create an enforceable interest that is permitted under ERISA's statutory scheme. See Hamilton, 433 F.3d at 1097-99. A valid DRO can be any judgment, decree, or order which (1) `relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependant of a participant,' and (2) `is made pursuant to a State domestic relations law.' 29 U.S.C. § 1056(d)(3)(B)(ii). Among other things, a DRO is valid under ERISA only if it recognizes the existence of an alternate payee's right to receive benefits `payable with respect to a participant under a plan.' Id. at § 1056(d)(3)(B)(i)(I). Additionally, a DRO may not require a plan to provide any type or form of benefit, or any option not otherwise provided by the plan, or to provide increased benefits to an alternate payee. Id. at § 1056(d)(3)(D).
(6)"The two limitations work together. The first limitation concerns the form of the state court order: the state DRO may create an alternate payee's enforceable interest, but the alternate payee may not enforce that interest *842 unless and until he or she has complied with the QDRO specificity provisions. See Tise, 234 F.3d at 421. The second limitation is substantive: certain alterations to the benefits provided by a plan governed by ERISA are forbidden. Thus, in certain respects, ERISA limits what a state family court can order. See Hamilton, 433 F.3d at 1098-1100." (Carmona, supra, 544 F.3d at p. 999.)

III. Hopkins, Tise, Carmona

At the time the trial court entered its order in this case, there appeared to be two lines of authority on the question of whether a former spouse with an interest in the participant spouse's pension is required to obtainor at least to seeka QDRO before the plan participant's retirement or preretirement death, where the plan participant is married to another at that benefit-triggering event.[5]
A. Hopkins. One line of cases holds that without a preexisting QDRO, the surviving spouse benefits vest entirely in the subsequent spouse on the date the participant retires so that a state DRO (domestic relations order) is not an enforceable QDRO where it has not been obtained before retirement of the plan participant. (Hopkins v. AT & T Global Information Solutions Co. (4th Cir. 1997) 105 F.3d 153, 157 (Hopkins); accord, Rivers v. Central and South West Corp. (5th Cir. 1999) 186 F.3d 681, 683 (Rivers); see also Samaroo v. Samaroo (3d Cir. 1999) 193 F.3d 185, 186, 190-191 [holding nunc pro tunc amendment of a DRO obtained after plan participant's preretirement death was not a QDRO under ERISA, because the order had the effect of increasing the plan's liability by conferring survivor benefits on a former spouse after her right to those plan benefits had lapsed on plan participant's death].)
B. Tise. In contrast to the Hopkins-Rivers line of cases, the reasoning of the Ninth Circuit in Trustees of Directors Guild of America v. Tise, supra, 234 F.3d 415, 422, footnote 6 (Tise), appeared to lead in a different direction. The Ninth Circuit held that a state court DRO obtained before a plan participant's retirement, death, or other benefit-triggering event, creates an enforceable interest in the participant's surviving spouse benefits even if the alternate payee (former spouse) is unable to qualify the DRO before the *843 participant's death. (Id. at p. 423; see Carmona, supra, 544 F.3d at p. 1001.) The plaintiff was therefore able to qualify the state court DRO as a QDRO in the 18 months following the plan participant's death. (Tise, at pp. 425-426.)
Tise reasoned that because the QDRO provision is an exception not only to ERISA's rule against assignment of plan benefits but also to ERISA's broad preemption provisions (§ 1144(b)(7)), state family law can "create enforceable interests in the proceeds of an ERISA plan, so long as those interests are articulated in accord with the QDRO provision's requirements" (Tise, supra, 234 F.3d at p. 420). Tise recognized the distinction between the alternate payee's interest in the pension plan proceeds, which is established by the state court DRO and the enforceability of that interest which requires a QDRO, stating: "Because a QDRO only renders enforceable an already-existing interest, there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." (Id. at p. 421.)[6]
Tise noted, but expressly did not address, the question "whether, as Hopkins[, supra, 105 F.3d 153] and Rivers[, supra, 186 F.3d 681] determined, the plan participant's retirement cuts off a putative alternate payee's right to obtain an enforceable QDRO substituting the alternate payee for the surviving spouse with regard to statutory surviving spouse benefits." (Tise, supra, 234 F.3d at p. 423, fn. 6.) Tise reasoned that "[w]hether a QDRO issued after a plan participant's retirement may affect the distribution of surviving spouse benefits pursuant to 29 U.S.C. § 1055 implicates statutory provisions and policy considerations other than those here applicable. [Citations.]" (Tise, at p. 423, fn. 6.)[7]
*844 Following Tise's line of reasoning, the Tenth Circuit in Patton v. Denver Post Corp. (10th Cir. 2003) 326 F.3d 1148, 1153 (Patton), expressly rejected the Third Circuit's conclusion in Samaroo, supra, 193 F.3d 185, that any change in beneficiary after a plan participant's death would "wreak actuarial havoc" on administration of the pension plan. (Samaroo, at p. 190.) Rather, Patton agreed with the Samaroo dissent that "[t]he holding in Samaroo `work[s] an unwarranted interference with the states' ability to administer their domestic relations law and to effectuate equitable divisions of marital assets.' [Citation.]" (Patton, at p. 1153, citing Samaroo, supra, 193 F.3d at p. 192 (dis. opn. of Mansmann, J.).)
The Hawaii Supreme Court in Torres v. Torres (2002) 100 Haw. 397 [60 P.3d 798] (Torres), relied upon Tise, supra, 234 F.3d 415, to hold that survivor benefits did not vest in the plan participant's widow on the date of the participant's eligibility for retirement or upon his death. (Torres, at p. 822.) Torres affirmed the family court's order amending the initial divorce decree after the plan participant's death, so that it could be approved as a QDRO. (Id. at pp. 805-806.) The court held that "[a]s long as ERISA's qualification requirements are met, any DRO permissible under state domestic relations law should be binding upon a pension plan." (Torres, at p. 817.) Torres declined to follow the holding of Hopkins, supra, 105 F.3d 153, that surviving spouse benefits vest in the participant's current spouse at the time of the participant's retirement. (Torres, at p. 822.) Because the widow did not argue that the family court's DRO required the plan to pay increased benefits beyond those it would have been expected to pay on the date of the plan participant's preretirement death, the court found it unnecessary to resolve "the competing interpretations" of Tise, supra, 234 F.3d 415, Patton, supra, 326 F.3d 1148 and Samaroo, supra, 193 F.3d 185, regarding actuarial soundness of pension plans or the related question of notice to the plan of the potential interest in pension plan benefits. (Torres, at p. 823, fn. 16.)
In Files v. ExxonMobile Pension Plan (3d Cir. 2005) 428 F.3d 478 (Files), the Third Circuit appears to have retreated somewhat from the full implications of the majority opinion in Samaroo, supra, 193 F.3d 185, reiterating that Samaroo was "expressly limited to its facts." (Files, at p. 487.) Files held that a property settlement agreement (PSA) granting an unmarried pension plan *845 participant's former spouse a separate interest in 50 percent of the participant's pension as of the date of the PSA, constituted a QDRO "pursuant to the process contemplated within 29 U.S.C. § 1056(d)(3), providing the ex-wife with a separate interest in the pension benefit prior to her ex-husband's death...." (Files, at p. 479.) It concluded that Samaroo did not control as the former spouse in Files was seeking a survivorship benefit provided for in the PSA. (Id. at p. 487.) The Files court also distinguished Hopkins, supra, 105 F.3d 153, on the grounds that "in Hopkins, there was an attempt to divest benefits already vested in a subsequent spouse, whereas here, there was no such vesting, and therefore, no such disruption to actuarial planning." (Files, at pp. 487-488, fn. 12.)
C. Hamilton and Carmona. In Hamilton, supra, 433 F.3d 1091, the Ninth Circuit held that "a surviving spouse benefit must be explicitly assigned to a former spouse in a QDRO in order to overcome the surviving spouse's right to a QPSA under ERISA." (Id. at pp. 1103-1104.) The dispute in Hamilton was between the widow of the plan participant and the plan participant's children from a previous marriage. The marital dissolution order required the plan participant to name the children as beneficiaries under his pension plans, but "made no reference to surviving spouse rights nor did it delineate which pension rights were at issue, the amounts to be paid or when the payments were to begin." (Id. at p. 1094.) The Ninth Circuit held, first, that "the purported assignment of pension rights did not meet the strict requirements of a QDRO" and, second, that even were the DRO liberally construed as a QDRO, "under the statutory language coupled with a complementary interpretation of the plans, the surviving spouse benefit must be explicitly assigned to a former spouse in a QDRO in order to overcome the surviving spouse's right to an annuity under ERISA." (Ibid.)[8]
In a case involving a dispute between the eighth and ninth wives of the plan participant, the Ninth Circuit in Carmona, supra, 544 F.3d 998, recently *846 appears to have moved away from the full implications of its opinion in Tise, supra, 234 F.3d at page 423, and has followed the Fourth Circuit's holding in Hopkins, supra, 105 F.3d 153, while not adopting its entire rationale. In Carmona, the final two wives of the plan participant (his spouse at the time of his retirement and his spouse at the time of his death) argued over who was the rightful surviving spouse beneficiary for purposes of his retirement plan. (Carmona, at p. 993.) Joining the Fourth Circuit in Hopkins, the Ninth Circuit held "that QJSA surviving spouse benefits irrevocably vest in the participant's spouse at the time of the annuity start datein this case the participant's retirementand may not be reassigned to a subsequent spouse." (Carmona, at p. 993, fn. omitted.) The court identified the issue as one "of first impression in this Circuit: whether a `plan participant's retirement cuts off a putative alternate payee's right to obtain an enforceable QDRO' with regard to the surviving spouse benefits of a QJSA." (Id. at p. 1000, citing Tise, supra, 234 F.3d at p. 423, fn. 6 [leaving open the question].)
Carmona relied upon Hopkins's analysis of section 1055 and the "[v]arious changes to ERISA created by the REA indicat[ing] that the participant's retirement or the start of the annuity establishes a vesting point for the surviving spouse benefits." (Carmona, supra, 544 F.3d at pp. 1000, 1002-1003, citing Hopkins, supra, 105 F.3d at pp. 156-157.) At the same time, Carmona reaffirmed its holding in Tise, supra, 234 F.3d at page 423, that "so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death. [Citation.]" (Carmona, at p. 1001; see id. at p. 1004.) Reaffirming Tise's rejection of "part of the Fourth Circuit's reasoning in Hopkins," the court was "nonetheless persuaded by the structure and purpose of ERISA that the rule enunciated in Hopkins is the proper rule for QJSA benefits." (Carmona, at p. 1001.)[9]
*847 Carmona identified uniformity of interpretation and simplicity of application of pension plans "one of the principal goals underlying ERISA" served by a vesting rule. (Carmona, supra, 544 F.3d at p. 1003, citing McGowan v. NJR Service Corp. (3d Cir. 2005) 423 F.3d 241, 246, disapproved on another ground in Kennedy v. Plan Administrator for DuPont Sav. And Investment Plan (2009) ___ U.S. ___, ___, fn. 4 [172 L.Ed.2d 662, 129 S.Ct. 865, 870, fn. 4].) The court also embraced the actuarial certainty and finality rationale as noted in Hopkins, supra, 105 F.3d at page 157, footnote 7. (Carmona, at pp. 1003-1004.)
Carmona was at pains to note that "this opinion does not disturb our prior holding in Tise. Fundamentally, Tise answers a very different question from the one presented here. In Tise, we determined when a DRO, which creates an enforceable interest in an alternate payee, can be `qualified' for QPSA benefits. Tise established that a state court domestic relations order may be qualified even after a participant's death, `[b]ecause a QDRO only renders enforceable an already-existing interest.' [Tise, supra,] 234 F.3d at 421. In contrast, here we ask whether there are any restrictions as to when a state can create an enforceable interest in an alternate payee for QJSA surviving spouse benefits. We hold here only that a state DRO may not create an enforceable interest in surviving spouse benefits to an alternate payee after a participant's retirement, because ordinarily at retirement the surviving spouse's interest irrevocably vests." (Carmona, supra, 544 F.3d.3d at p. 1004, italics added, fn. omitted.) The caveat is the Carmona court's recognition that "there may be other situations ... in which a contrary result may be appropriate. For example, it is possible that a former spouse could obtain a DRO prior to the annuity start date and present it to the plan, but the actual determination of whether the DRO is a QDRO might not be finalized prior to the date on which the benefit would normally become payable. See, e.g., 29 U.S.C. § 1056(d)(3)(H)." (Carmona, at pp. 1004-1005, fn. 12.) Moreover, citing its opinion in Hamilton, supra, 433 F.3d at page 1099, the Carmona court reiterated that ERISA only permits state court DRO's to reassign surviving spouse benefits if they meet the specificity requirements of section 1056(d)(3)(F) and then "only if the QDRO expressly assigns surviving spouse rights to a former spouse." (Carmona, at p. 1005.)
The Ninth Circuit also concluded that the state court had impermissibly created a constructive trust on pension annuity proceeds, finding such action preempted by ERISA. (Carmona, supra, 544 F.3d at pp. 1006-1007.) "[A] state court cannot achieve through a constructive trust on the proceeds of a pension plan what this court maintains it cannot achieve through a QDRO. Any alternative rule would allow for an end-run around ERISA's rules and *848 Congress's policy objective of providing for certain beneficiaries, thereby greatly weakening, if not entirely abrogating, ERISA's broad preemption provision." (Id. at p. 1006.) Consequently, the court concluded that the eighth wife's interest in surviving spouse benefits vested at the plan participant's retirement and that federal law preempted the state court orders directing the plans to change the beneficiaries and creating a constructive trust. (Id. at pp. 1007-1008.)

IV. Application
In ruling that former spouse Beverly could obtain a QDRO after Robert's death 19 years after the dissolution, the court below relied upon Tise, supra, 234 F.3d 415, reiterating its reasoning that there was "no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." (Id. at p. 421.) Donna attempted to distinguish Tise on the grounds that in Tise spousal survivor benefits were not at issue and the plan in Tise had notice of the claim before the plan participant's death. The trial court rejected these distinctions.
(7) Donna argues, based upon Hopkins, supra, 105 F.3d 153 and Rivers, supra, 186 F.3d 681, that "uniform federal appellate precedent holds that retirement irrevocably vests an ERISA surviving spouse benefit" and that a QDRO after the retirement or preretirement death of the plan participant cannot alienate part of that benefit to an alternate payee. We shall conclude, consistent with the holdings of the Ninth Circuit in both Carmona, supra, 544 F.3d 988 and Tise, supra, 234 F.3d 415, that while preretirement death ordinarily irrevocably vests the right to survivor benefits in the existing spouse, a DRO possessed by a former spouse before the plan participant's death may be qualified as a QDRO postmortem where the DRO substantially complies with ERISA's specificity requirements for a QDRO. Here, however, the DRO did not substantially meet QDRO requirements at the time of the plan participant's preretirement death. Although the nunc pro tunc order of the court amended the DRO to meet QDRO requirements, it went far beyond the limits recognized in California for entry of nunc pro tunc orders. Therefore, we must reverse.
Those federal circuits considering the question of "vesting" of survivor spouse benefits in the plan participant's spouse at the time benefits become payable (on the plan participant's retirement or preretirement death[10]) have concluded either that the former spouse must have perfected a QDRO at the *849 time the benefits become payable (Hopkins, supra, 105 F.3d 153; Rivers, supra, 186 F.3d 681) or that in order to effect a postmortem qualification of the DRO as a QDRO, there must have been a DRO awarding the former spouse an interest in the pension plan and substantially complying with QDRO specificity requirements at the time benefits became payable. (See Carmona, supra, 544 F.3d 988; Hamilton, supra, 433 F.3d 1091.)
Federal circuits that have allowed postmortem qualification of a DRO as a QDRO have taken pains to point out that the plan participant had not remarried and there was no spouse at the time benefits became payable. Consequently there was no issue of "vesting" of pension plan benefits in an existing spouse. (See Files, supra, 428 F.3d at pp. 484, 488; Hogan v. Raytheon, Co. (8th Cir. 2002) 302 F.3d 854, 856; Patton, supra, 326 F.3d at p. 1150; Tise, supra, 234 F.3d at pp. 418, 423, fn. 6; but see Torres, supra, 60 P.3d at p. 805 [Hawaii Supreme Court].)
In Tise, supra, 234 F.3d 415, the Ninth Circuit expressly had left open the questions of whether a plan participant's retirement cut off the former spouse's right to obtain a QDRO with regard to statutory surviving spouse benefits (id. at p. 423, fn. 6), whether such order could be entered nunc pro tunc (id. at p. 426, fn. 10), and whether a QDRO could issue after a plan participant's death if the plan lacked notice of the DRO-created interest before death (id. at p. 426, fn. 9). The Ninth Circuit answered the surviving spouse question in Carmona, supra, 544 F.3d 988, concluding that it "ordinarily" would follow the irrevocable vesting rule of Hopkins, unless at the time of the plan participant's retirement or preretirement death, the former spouse possessed a DRO specifically awarding surviving spouse benefits and had presented it to the plan. In such circumstances, the surviving spouse could engage in the statutorily contemplated process of qualifying the DRO as a QDRO even after the plan participant's death. (Carmona, at p. 1004, fn. 12.)
The cases are inconsistent in their views of whether notice to the plan of an alternate payee's claim is required to be received before the benefit-triggering event. (Compare, e.g., Carmona, supra, 544 F.3d at p. 1004 [calculation and payment of pension benefits make it important for plan administrator to know to whom benefits are payable at benefit-triggering event]; Hopkins, supra, 105 F.3d at p. 157, fn. 7 [same] with Files, supra, 428 F.3d at p. 488 [nothing in ERISA requires notice to plan before participant's death]; Patton, supra, 326 F.3d at p. 1151 [declining to infer a notice requirement].) Actuarial certainty is related to the question of notice. Carmona adopts the Hopkins *850 court's view of actuarial certainty, reasoning that "it is important for the plan administrators to know, with some finality, who the spouse is at the time that the benefits become payable." (Carmona, at p. 1004.)
Although the trial court in this case concluded that "the Fund apparently knew that there was an ex-spouse who might be making a claim, as evidenced by its letter to Donna dated March 9, 2005," all indications in the record are that this letter relates to Beverly's contacting the Plan in February 2005 after Robert's death in January 2005, and providing them with a copy of the judgment of dissolution. There is no evidence in the record that any notice was provided to the Plan at any time before Robert's death that Beverly might have a claim. Beverly herself declared that her counsel had not sought a QDRO perfecting her interest, that she did not know she needed to take further legal action to protect her community property interest in the pension plan, and that she had intended to take further action after Robert retired.
Nevertheless, the plan did segregate funds and did not pay to Donna any funds that arguably were due Beverly under the amended DRO. Moreover, as in Torres, supra, 60 P.3d at page 823, footnote 16, on appeal Donna has made no specific claim that the actuarial certainty of the Plan would be compromised or otherwise affected by qualification of the amended DRO as a QDRO or by Beverly's failure to notify the Plan before Robert's death of Beverly's claimed interest.[11] Therefore, we need not determine whether ERISA requires notice to the pension plan before the benefit-triggering event (here Robert's preretirement death), as Carmona appears to conclude. (See Carmona, supra, 544 F.3d at p. 1004, fn. 12.)
There is no doubt that the original DRO in this case did not meet the specificity requirements of ERISA to allow it to be qualified as a QDRO. The only reference at all to Robert's pension benefits in the DRO was the provision that: "The court shall reserve jurisdiction over husband's pension plan." (Italics added.) This language gives no indication that the parties intended to divide the pension benefits, or how, or that they or the court intended to create an interest in the Plan in Beverly. In none of the cases we have reviewed was the mere reservation of jurisdiction sufficient to support amending the order nunc pro tunc to award surviving spouse benefits. In each case allowing postmortem qualification of a DRO as a QDRO, the court found either that the original DRO substantially met QDRO requirements or, *851 at a minimum, that the spouse seeking to amend the DRO nunc pro tunc to meet QDRO specification requirements had been awarded some interest in the retirement plan in the original DRO. (See Files, supra, 428 F.3d at pp. 479-480 [property settlement agreement incorporated into judgment of divorce entered before participant's death constituted a QDRO where it awarded former spouse one-half of the pension]; Patton, supra, 326 F.3d at p. 1150 [parties divided the one disclosed plan in a QDRO, naming former spouse as surviving spouse in the event of participant's death]; Hogan v. Raytheon, Co., supra, 302 F.3d at p. 855 [decree awarded former spouse one-half of participant's "`present retirement funds,' to be set forth in a separate [QDRO]"]; Torres, supra, 60 P.3d at pp. 804-805 [decree awarded former spouse a share of retirement plan "`if, as, and when [plan participant] commences to receive the same'" according to a formula specified in the decree]; cf. Tise, supra, 234 F.3d at pp. 425-426 [writ of execution issued before participant's death and directing the plan to pay alternate payee specified sum from monies held in plan participant's name recognized alternate payee's right to receive all or a portion of benefits payable with respect to the plan participant and sufficed to allow alternate payee to perfect the DRO into a QDRO within the 18-month period specified in ERISA].)
After Robert's death, the trial court here granted Beverly's motion to divide the plan survivor's benefit as an unadjudicated community asset and to have the requested QDRO made effective nunc pro tunc to a date before Robert's death.
(8) The Ninth Circuit has interpreted the provisions of ERISA allowing state court DRO's to reassign surviving spouse benefits (§ 1056(d)(3)(F)) "as permitting a transfer of surviving spouse benefits established under section 1055 only if the QDRO expressly assigns surviving spouse rights to a former spouse. [Citation.]" (Carmona, supra, 544 F.3d at p. 1005, italics added; see Hamilton, supra, 433 F.3d at p. 1099.) We would not necessarily go so far as to preclude nunc pro tunc amendment where the original DRO creates some rights in the pension plan in a former spouse, but does not specifically award surviving spouse benefits. However, we believe the nunc pro tunc amendment here went too far where the original state court DRO did not award Beverly any actual interest in the pension plan, but simply reserved jurisdiction in the court to do so at some future point.
(9) "A nunc pro tunc order or judgment is one entered as of a time prior to the actual entry, so that it is treated as effective at the earlier date. This retroactive entry is an exercise of inherent power of the court, the object being to do justice to a litigant whose rights are threatened by a delay that is not the litigant's fault. [Citations.]" (7 Witkin, Cal. Procedure, supra, Judgment, § 60, p. 595.) There are limits on a court's power to enter orders nunc pro tunc. (Id., § 61, p. 596.)
*852 In Hamilton v. Laine (1997) 57 Cal.App.4th 885 [67 Cal.Rptr.2d 407], we addressed these limits in holding that the trial court had exceeded its authority by entering nunc pro tunc an order establishing a special needs trust for a minor 10 years after entry of judgment establishing a medical trust for the minor, where the special needs trust was not initially intended by the court and where it deprived another party of its rights under a statutory lien. We acknowledged that our decision did not turn on equities of the case or the policy arguments on each side. "Instead, it turns on well-established principles limiting the use of nunc pro tunc entries to correct an error or omission in the original order or judgment." (Id. at p. 890.)
(10) "The scope of orders and judgments nunc pro tunc in California has consistently been described by our Supreme Court in the following terms: `A court can always correct a clerical, as distinguished from a judicial error which appears on the face of a decree by a nunc pro tunc order. [Citations.] It cannot, however, change an order which has become final even though made in error, if in fact the order made was that intended to be made.... "The function of a nunc pro tunc order is merely to correct the record of the judgment and not to alter the judgment actually renderednot to make an order now for then, but to enter now for then an order previously made. The question presented to the court on a hearing of a motion for a nunc pro tunc order is: What order was in fact made at the time by the trial judge?"' (Estate of Eckstrom (1960) 54 Cal.2d 540, 544 [7 Cal.Rptr. 124, 354 P.2d 652], italics omitted.) The court went on to hold nunc pro tunc orders may not be made to `make the judgment express anything not embraced in the court's decision, even though the proposed amendment contains matters which ought to have been so pronounced. [Citations.]' (Ibid.) `It is only when the form of the judgment fails to coincide with the substance thereof, as intended at the time of the rendition of the judgment, that it can be reached by a corrective nunc pro tunc order.' (Id. at p. 545; accord, [citations].)" (Hamilton v. Laine, supra, 57 Cal.App.4th at p. 890; accord, APRI Ins. Co. v. Superior Court (1999) 76 Cal.App.4th 176, 185 [90 Cal.Rptr.2d 171].) "To summarize, it is not proper to amend an order nunc pro tunc to correct judicial inadvertence, omission, oversight or error, or to show what the court might or should have done as distinguished from what it actually did. An order made nunc pro tunc should correct clerical error by placing on the record what was actually decided by the court but was incorrectly recorded. It may not be used as a vehicle to review an order for legal or judicial error by `correcting' the order in order to enter a new one." (Hamilton v. Laine, at p. 891.)
Here, the most that can be said with respect to the provision of the DRO reserving jurisdiction over the plan participant's pension is that the parties likely did not agree to disposition of pension assets and the court intended to address the issue at a later day. We can only speculate that, because California is a community property state, the court could have intended to *853 confirm to Beverly an interest in the pension at some point, and that such interest might include surviving spouse benefits. Such speculation is inadequate based on the complete absence of any support in the record as to the court's or the parties' intentions beyond the reservation of jurisdiction itself.
(11) We are mindful of the broad authority of courts to enter judgment nunc pro tunc in dissolution proceedings. (See Fam. Code, § 2346 [authorizing a court to enter judgment nunc pro tunc in cases in which "the court determines that a judgment of dissolution of the marriage should be granted, but by mistake, negligence, or inadvertence, the judgment has not been signed, filed, and entered...."]; Patton, supra, 326 F.3d at pp. 1152-1154; Samaroo, supra, 193 F.3d at pp. 193-194 (dis. opn. of Mansmann, J.).) The Patton court agreed with the Samaroo dissent that "[t]he holding in Samaroo [that a state court's power to enter or modify a QDRO with respect to a participant's interest in a pension plan ends with the participant's death] `work[s] an unwarranted interference with the states' ability to administer their domestic relations law and to effectuate equitable divisions of marital assets.' [Citation.]" (Patton, at p. 1153, citing Samaroo, at p. 192 (dis. opn. of Mansmann, J.).) Quoting from an article from the periodical of the American Bar Association's Family Law Section, written by Gary Shulman, author of the Qualified Domestic Relations Order Handbook, the Patton court stated: "`Nunc pro tunc QDROs are desperately needed in the domestic relations arena. There must be a way to secure a former spouse's property rights to a pension that could suddenly disappear as a result of a technicality or a family law attorney's inexperience in drafting QDROs.' Gary Schulman, QDROs The Ticking Time Bomb, 23 FAMILY ADVOCATE 26, 29 (2001)." (Patton, at pp. 1153-1154.) Patton concluded, "In sum, this is precisely the type of situation, particularly in the domestic relations arena, for which the nunc pro tunc doctrine is appropriate. Courts in domestic relations contexts must have the power to effect equitable settlements by responding to newly acquired information or to changes in circumstances. If necessary changes once effected by the state court are not then recognized by plan administrators or by federal courts adjudicating disputes, state courts are effectively stripped of their ability to equitably distribute marital assets in a divorce." (Id. at p. 1154, fn. omitted.)
In his dissent in Samaroo, supra, 193 F.3d at pages 191-195, Judge Mansmann argued that important policy interests were furthered by giving effect to the state court's decree: "There is good reason to allow state courts some leeway in entering or modifying domestic relations orders even after a participant's death, or retirement, or other status-altering event. The state courts are charged with administering the important, and often complex and volatile, area of domestic relations law. The evident purpose of the ERISA's recognition of QDROs is to avoid undue interference with state courts' fulfillment of that charge. Imposing a cut-off date by which a state court's *854 orders must be in prescribed forma cut-off that does not appear anywhere in the text of ERISAwould unnecessarily impede those courts' efforts to provide for a just disposition of marital assets." (Id. at pp. 193-194, fns. omitted (dis. opn. of Mansmann, J.).)
However, as we have observed, those decisions allowing nunc pro tunc amendments of the DRO to meet QDRO specificity requirements after the death or retirement of the plan participant, did so in circumstances where the original state court DRO at a minimum created in the former spouse some interest in the pension plan. In Patton, supra, 326 F.3d 1148, the court analogized the nunc pro tunc order awarding the former spouse surviving spouse benefits in the newly discovered plan in the same manner as the parties had agreed to distribute assets in the known pension plan. The court reasoned that the nunc pro tunc order was not being used to "rewrite historical facts. Rather, it is more akin to the correction of a clerical error, which is an accepted use for nunc pro tunc orders." (Id. at p. 1153.) The parties previously lacked full information as to the assets to be distributed in the settlement. When discovered, "the court simply allotted them as it had intended under the original plan, i.e., as it would have done had it been aware of their existence at the time. The historical facts were not changedtwo pension plans existed on the date of the divorce as well as the date of death." Moreover, the Patton court specifically observed that "[n]o other person's vested interest was upset by this action." (Ibid.)
Even the dissent in Samaroo, supra, 193 F.3d 185, which would have affirmed entry nunc pro tunc of the QDRO, recognized the limitations of entry of a nunc pro tunc order, observing: "Post-death (or post-retirement) entry or modification of a decree may reasonably occur in a variety of circumstances, including, e.g., clerical error, appeals, and delays attendant on the formulation of an appropriate order. This is an example of the former...." (Id. at p. 194, fn. 8 (dis. opn. of Mansmann, J.).) The plan participant's attorney testified that the participant indicated his intent that the former spouse receive half interest in "`everything he had or was entitled to' and that it was only due to the attorney's unfamiliarity with ERISA that the survivor designation was erroneously omitted." (Ibid.)
(12) Entry of a nunc pro tunc order following the retirement or preretirement death of the plan participant to facilitate qualification of a DRO as a QDRO where the DRO was obtained before the benefit-triggering event is proper in circumstances where the record indicates that the parties or the court intended the state court DRO to create an interest in surviving spouse *855 benefits in the former spouse. However, where the DRO obtained before the benefit-triggering event does not create the right that the former spouse seeks to enforce as a QDRO against the plan, a nunc pro tunc order entered after the benefit-triggering event cannot create the right. Such order goes beyond the confines of the nunc pro tunc power of the court.
(13) Allowing the state court to modify the DRO to create the interest in the surviving spouse pension benefits after the benefit-triggering event, in the absence of substantial evidence that the parties or the court intended to create such interest in the original DRO, has the potential to undermine the entire QDRO scheme. The conceptual framework articulated by the Ninth Circuit in Tise and recognized by that court in Hamilton and Carmona, allowing in some circumstances for a QDRO to be obtained after the benefit-triggering event, contemplates that the "QDRO only renders enforceable an already-existing interest...." (Tise, supra, 234 F.3d at p. 421, italics added; see Carmona, supra, 544 F.3d at pp. 1001, 1004; Hamilton, supra, 433 F.3d at pp. 1096-1099.) As the Ninth Circuit has explained, to qualify as a QDRO, the DRO must meet the specificity requirements set forth in ERISA. (Carmona, supra, 544 F.3d at p. 999.) "These requirements allow a plan administrator to more easily administer the plan and reduce the risk of making improper payments. [Citation.]" (Ibid.) "Once the pension plan is on notice that a domestic relations order has issued that may be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO...." (Tise, supra, 234 F.3d at p. 421; accord, Carmona, at p. 1001.) "ERISA provides for further state court proceedings after the initial DRO is issued to clarify and fix any technical defects in the original DRO. [Citation.] Therefore, ... so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death. [Citation.]" (Carmona, at p. 1001, italics added.)
(14) The order issued nunc pro tunc by the court below did far more than clarify, fix technical defects, or correct the original DRO to express the court's intent or that of the parties' at the time of the decree. Nor did it simply allow Beverly to perfect a deficient DRO to meet ERISA's technical requirements for a QDRO. Rather, the nunc pro tunc order created the interest in the Plan by awarding Beverly an interest in the pension plan and qualified such DRO as a QDRO. We are convinced the trial court in this case exceeded its power to issue a DRO or QDRO nunc pro tunc, where the original DRO evinced no intent to award Beverly an interest in Robert's pension benefits and, a fortiori, no intent to award her any interest in QPSA surviving spouse benefits.

*856 DISPOSITION
For the foregoing reasons, we conclude the trial court had no authority to grant Beverly's request for entry of the DRO awarding her surviving spouse benefits nunc pro tunc and we reverse that order; we reinstate the DRO originally entered by the court; and we reverse the judgment determining the DRO to be a QDRO. Each party is to bear her own costs.
Haerle, J., and Richman, J., concurred.
NOTES
[1] In the interests of clarity, we refer to all parties by their first names.
[2] All statutory references are to title 29 of the United States Code, unless otherwise indicated.
[3] The record does not contain any document by the Plan stating that it determined the proposed QDRO either did or did not satisfy QDRO specificity requirements. No party argues that it did not and the court found the order was intended to satisfy federal law requirements concerning QDRO's, including ERISA and the Internal Revenue Code.
[4] "Section 1055(a)(1) states that `in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity' (emphasis added). This provision, known as the `QJSA' provision, does not apply here because [the plan participant] died prior to the annuity starting date." (Hamilton, supra, 433 F.3d at p. 1095, fn. 3.)
[5] We use the phrase "benefit-triggering event" to refer to the participant's retirement or preretirement death. We use the phrase "annuity start date" to refer variously to the participant's "retirement date" where benefit payments would begin on that date (§ 1055(a)) or to the date upon which spousal survival benefits would be payable in the case of the participant's preretirement death (§ 1055(e)(1)). (See Carmona, supra, 544 F.3d at p. 993, fn. 2.)
[6] As the Ninth Circuit in Carmona later summarized its reasoning in Tise: "We came to this conclusion by analyzing the complex ERISA framework and meticulously considering the provisions of the statute that contemplate a situation in which a valid QDRO does not issue until after benefits become payable. We concluded that ERISA `specifically provides for situations in which no valid QDRO issues until after benefits become payable. Once the pension plan is on notice that a domestic relations order has issued that may be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO....' [Tise, supra, 234 F.3d at p.] 421. Furthermore, ERISA provides for further state court proceedings after the initial DRO is issued to clarify and fix any technical defects in the original DRO. Id. at 422 (citing 29 U.S.C. § 1056(d)(3)). Therefore, we have held that so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death. Id. at 423." (Carmona, supra, 544 F.3d at p. 1001.)
[7] Tise concluded that because the alternate payee had placed the plan on notice of her interest in the plan participant's pension plan proceeds before his death, the fact that he died before the QDRO issued was immaterial. (Tise, supra, 234 F.3d at p. 426.) The alternate payee had obtained her QDRO within the 18-month period provided by the statute for segregating funds for the alternate payee's benefit. "[S]he is therefore entitled to a share of [the] pension plan proceeds as determined by the state court pursuant to state law...." (Id. at p. 426, fn. omitted.) Tise noted that it was not deciding whether a QDRO could issue after a participant's death if the plan had no notice of the DRO-created interest before the death. (Id. at p. 426, fn. 9.) Nor did it determine whether the state court properly granted a 1996 order after the participant's death awarding the alternate payee the right to collect child support arrears and attorney's fees nunc pro tunc to October 1991, a date before the participant's death, "or whether the Full Faith and Credit statute, 28 U.S.C. § 1738, would require a federal court to give full effect to the order's nunc pro tunc aspect." (Tise, at p. 426, fn. 10.)
[8] The order did not require any action by the plans, did not assign death benefits to the children, did not specify when payments were to begin, or the amount, calculation or form of the payments. Nor did the order deal with the issue of the surviving spouse annuity. (Hamilton, supra, 433 F.3d at pp. 1097-1098.) Recognizing that "[w]ithout a doubt, the details required in a QDRO present a drafting morass for the lawyer," the Ninth Circuit commented that the "`failure to include a survivorship provision in the QDRO often goes undetected until the participant dies or retires, that is, when the survivor benefits irrevocably vest in the current spouse and it is too late to do anything about it.'" (Id. at p. 1096, citation omitted, italics added.) Observing that it had rejected an "unduly narrow reading of [statutory] requirements" for a QDRO, the court still demanded "substantial compliance with these requirements.... [Citation.]" (Id. at p. 1097, citing Tise, supra, 234 F.3d at p. 420, among others.) Hamilton framed the "pivotal question" as "whether the dissolution order `clearly contains the information specified in the statute that a plan administrator would need to make an informed decision.' [Citation.]" (Hamilton, at p. 1097.) It concluded the "paucity of relevant information in the dissolution order compels a negative answer." (Ibid.)
[9] Carmona identified the following statutory features as persuasive: The importance of the annuity start date established by ERISA's statutory scheme for QJSA benefits. QJSA benefits are automatically provided to employees in all ERISA-governed plans and only a formal written waiver by the participant and the current spouse within the election period"`the 180 day period ending on the annuity starting date'" (§ 1055(c)(2), (7)) allows the participant to opt out of the QJSA. (Carmona, supra, 544 F.3d at p. 1002.) Like the Fourth Circuit in Hopkins, supra, 105 F.3d 153, the Ninth Circuit in Carmona was also persuaded by the fact that surviving spouse benefits may be paid to a spouse who is married on the day of the participant's retirement, regardless of whether the participant and spouse are married at the participant's death. (Carmona, at p. 1002.) "Following this reasoning, we conclude that once a participant retires, the spouse at the time becomes the `surviving spouse' entitled to the QJSA benefits." (Ibid.) Carmona found the ultimate objectives of Congress were served by following the Hopkins rule that a QDRO may not reassign surviving spouse benefits after the retirement of the plan participant. "ERISA's surviving spouse benefits established in section 1055 were created in part `to ensure a stream of income to surviving spouses.' [Citation.]" (Carmona, at p. 1002, citing Boggs v. Boggs, supra, 520 U.S. 833, 843.)
[10] We see no distinction between qualified joint and survivor annuity benefits and qualified preretirement survivor annuity benefits for purposes of the QDRO qualification requirements. Nor have the parties argued that there are material distinctions between these two types of surviving spouse benefits for purposes of qualifying the DRO as a QDRO.
[11] Donna does claim notice was required by the cases, but does not explain how the lack of notice affected or compromised the Plan's actuarial certainty in this specific case.